# MORTON, SECRETARY OF THE INTERIOR, ET AL. *v.* MANCARI ET AL.

No. 73–362.  Argued April 24, 1974—Decided June 17, 1974*

---

*Together with No. 73–364, *Amerind* v. *Mancari et al.*, also on appeal from the same court.

536

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Harry R. Sachse* argued the cause for appellants in No. 73–362. With him on the brief were *Solicitor General Bork, Assistant Attorney General Pottinger, Carlton R. Stoiber,* and *M. Patricia Schaffer. Harris D. Sherman*

argued the cause for appellant in No. 73–364. With him on the briefs was *Stuart J. Land.*

*Gene E. Franchini* argued the cause and filed a brief for appellees in both cases.†

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The Indian Reorganization Act of 1934, also known as the Wheeler-Howard Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.,* accords an employment preference for qualified Indians in the Bureau of Indian Affairs (BIA or Bureau). Appellees, non-Indian BIA employees, challenged this preference as contrary to the anti-discrimination provisions of the Equal Employment Opportunity Act of 1972, 86 Stat. 103, 42 U. S. C. § 2000e *et seq.* (1970 ed., Supp. II), and as violative of the Due Process Clause of the Fifth Amendment. A three-judge Federal District Court concluded that the Indian preference under the 1934 Act was impliedly repealed by the 1972 Act. 359 F. Supp. 585 (NM 1973). We noted probable jurisdiction in order to examine the statutory and constitutional validity of this longstanding Indian preference. 414 U. S. 1142 (1974); 415 U. S. 946 (1974).

I

Section 12 of the Indian Reorganization Act, 48 Stat. 986, 25 U. S. C. § 472, provides:

"The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed, without regard to civil-service laws,

---

†Briefs of *amici curiae* urging reversal were filed by *Theodore S. Hope, Jr., William C. Pelster,* and *Joseph E. Fortenberry* for Montana Inter-Tribal Policy Board et al., and by *Sanford Jay Rosen* for the Mexican American Legal Defense and Educational Fund.

to the various positions maintained, now or hereafter, by the Indian Office,[1] in the administration of functions or services affecting any Indian tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions." [2]

In June 1972, pursuant to this provision, the Commissioner of Indian Affairs, with the approval of the Secretary of the Interior, issued a directive (Personnel Management Letter No. 72–12) (App. 52) stating that the BIA's policy would be to grant a preference to qualified Indians not only, as before, in the initial hiring stage, but also in the situation where an Indian and a non-Indian, both already employed by the BIA, were competing for a promotion within the Bureau.[3] The record indicates that this policy was implemented immediately.

---

[1] The Indian Health Service was transferred in 1954 from the Department of the Interior to the Department of Health, Education, and Welfare. Act of Aug. 5, 1954, § 1, 68 Stat. 674, 42 U. S. C. § 2001. Presumably, despite this transfer, the reference in § 12 to the "Indian Office" has continuing application to the Indian Health Service. See 5 CFR § 213.3116 (b) (8).

[2] There are earlier and more narrowly drawn Indian preference statutes. 25 U. S. C. §§ 44, 45, 46, 47, and 274. For all practical purposes, these were replaced by the broader preference of § 12. Although not directly challenged in this litigation, these statutes, under the District Court's decision, clearly would be invalidated.

[3] The directive stated:

"The Secretary of the Interior announced today [June 26, 1972] he has approved the Bureau's policy to extend Indian Preference to training and to filling vacancies by original appointment, reinstatement and promotions. The new policy was discussed with the National President of the National Federation of Federal Employees under National Consultation Rights NFFE has with the Department. Secretary Morton and I jointly stress that careful attention must be given to protecting the Rights of non-Indian employees. The new policy provides as follows: Where two or more candidates who meet

Shortly thereafter, appellees, who are non-Indian employees of the BIA at Albuquerque,[4] instituted this class action, on behalf of themselves and other non-Indian employees similarly situated, in the United States District Court for the District of New Mexico, claiming that the "so-called 'Indian Preference Statutes,'" App. 15, were repealed by the 1972 Equal Employment Opportunity Act and deprived them of rights to \property without due process of law, in violation of the Fifth Amendment.[5] Named as defendants were the Secretary of the Interior, the Commissioner of Indian Affairs, and the BIA Directors for the Albuquerque and Navajo Area Offices. Appellees claimed that implementation and enforcement of the new preference policy "placed and will continue to place [appellees] at a distinct disadvantage in competing for promotion and training programs with Indian employees, all of which has and will continue to subject the [appellees] to discrimination and deny them equal employment opportunity." App. 16.

the established qualification requirements are available for filling a vacancy. If one of them is an Indian, he shall be given preference in filling the vacancy. This new policy is effective immediately, and is incorporated into all existing programs such as the Promotion Program. Revised Manual releases will be issued promptly for review and comment. You should take immediate steps to notify all employees and recognized unions of this policy." App. 52–53.

[4] The appellees state that none of them is employed on or near an Indian reservation. Brief for Appellees 8. The District Court described the appellees as "teachers . . . or programmers, or in computer work." 359 F. Supp. 585, 587 (NM 1973).

[5] The specific question whether § 12 of the 1934 Act authorizes a preference in promotion as well as in initial hiring was not decided by the District Court and is not now before us. We express no opinion on this issue. See *Freeman* v. *Morton*, 162 U. S. App. D. C. 358, 499 F. 2d 494 (1974). See also *Mescalero Apache Tribe* v. *Hickel*, 432 F. 2d 956 (CA10 1970), cert. denied, 401 U. S. 981 (1971) (preference held inapplicable to reduction in force).

540

A three-judge court was convened pursuant to 28 U. S. C. § 2282 because the complaint sought to enjoin, as unconstitutional, the enforcement of a federal statute. Appellant Amerind, a nonprofit organization representing Indian employees of the BIA, moved to intervene in support of the preference; this motion was granted by the District Court and Amerind thereafter participated at all stages of the litigation.

After a short trial focusing primarily on how the new policy, in fact, has been implemented, the District Court concluded that the Indian preference was implicitly repealed by § 11 of the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 111, 42 U. S. C. § 2000e–16 (a) (1970 ed., Supp. II), proscribing discrimination in most federal employment on the basis of race.[6] Having found that Congress repealed the preference, it was unnecessary for the District Court to pass on its constitutionality. The court permanently enjoined appellants "from implementing any policy in the Bureau of Indian Affairs which would hire, promote, or reassign any person in preference to another solely for the reason that such person is an Indian." The execution and enforcement of the judgment of the District Court was

---

[6] Section 2000e–16 (a) reads:

"All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of Title 5, in executive agencies (other than the General Accounting Office) as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the legislative and judicial branches of the Federal Government having positions in the competitive service, and in the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin."

stayed by Mr. Justice Marshall on August 16, 1973, pending the disposition of this appeal.

## II

The federal policy of according some hiring preference to Indians in the Indian service dates at least as far back as 1834.[7]  Since that time, Congress repeatedly has enacted various preferences of the general type here at issue.[8]  The purpose of these preferences, as variously expressed in the legislative history, has been to give Indians a greater participation in their own self-government;[9] to further the Government's trust obliga-

[7] Act of June 30, 1834, § 9, 4 Stat. 737, 25 U. S. C. § 45:

"[I]n all cases of the appointments of interpreters or other persons employed for the benefit of the Indians, a preference shall be given to persons of Indian descent, if such can be found, who are properly qualified for the execution of the duties."

[8] Act of May 17, 1882, § 6, 22 Stat. 88, and Act of July 4, 1884, § 6, 23 Stat. 97, 25 U. S. C. § 46 (employment of clerical, mechanical, and other help on reservations and about agencies); Act of Aug. 15, 1894, § 10, 28 Stat. 313, 25 U. S. C. § 44 (employment of herders, teamsters, and laborers, "and where practicable in all other employments" in the Indian service); Act of June 7, 1897, § 1, 30 Stat. 83, 25 U. S. C. § 274 (employment as matrons, farmers, and industrial teachers in Indian schools); Act of June 25, 1910, § 23, 36 Stat. 861, 25 U. S. C. § 47 (general preference as to Indian labor and products of Indian industry).

[9] Senator Wheeler, cosponsor of the 1934 Act, explained the need for a preference as follows:

"We are setting up in the United States a civil service rule which prevents Indians from managing their own property. It is an entirely different service from anything else in the United States, because these Indians own this property. It belongs to them. What the policy of this Government is and what it should be is to teach these Indians to manage their own business and control their own funds and to administer their own property, and the civil service has worked very poorly so far as the Indian Service is concerned . . . ." Hearings on S. 2755 and S. 3645 before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 2, p. 256 (1934).

tion toward the Indian tribes; [10] and to reduce the negative effect of having non-Indians administer matters that affect Indian tribal life.[11]

The preference directly at issue here was enacted as an important part of the sweeping Indian Reorganization Act of 1934. The overriding purpose of that particular Act was to establish machinery whereby Indian tribes. would be able to assume a greater degree of self-government, both politically and economically.[12] Congress was seeking to modify the then-existing situation whereby the primarily non-Indian-staffed BIA had plenary control, for all practical purposes, over the lives and destinies of the federally recognized Indian tribes. Initial congressional proposals would have diminished substantially the role of the BIA by turning over to federally chartered self-governing Indian communities many of the func-

---

[10] A letter, contained in the House Report to the 1934 Act, from President F. D. Roosevelt to Congressman Howard states:

"We can and should, without further delay, extend to the Indian the fundamental rights of political liberty and local self-government and the opportunities of education and economic assistance that they require in order to attain a wholesome American life. This is but the obligation of honor of a powerful nation toward a people living among us and dependent upon our protection." H. R. Rep. No. 1804, 73d Cong., 2d Sess., 8 (1934).

[11] "If the Indians are exposed to any danger, there is none greater than the residence among them of unprincipled white men." H. R. Rep. No. 474, 23d Cong., 1st Sess., 98 (1834) (letter dated Feb. 10, 1834, from Indian Commissioners to the Secretary of War).

[12] As explained by John Collier, Commissioner of Indian Affairs:

"[T]his bill is designed not to prevent the absorption of Indians in white communities, but rather to provide for those Indians unwilling or unable to compete in the white world some measures of self-government in their own affairs." Hearing on S. 2755 before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 1, p. 26 (1934).

tions normally performed by the Bureau.[13] Committee sentiment, however, ran against such a radical change in the role of the BIA.[14] The solution ultimately adopted was to strengthen tribal government while continuing the active role of the BIA, with the understanding that the Bureau would be more responsive to the interests of the people it was created to serve.

One of the primary means by which self-government would be fostered and the Bureau made more responsive was to increase the participation of tribal Indians in the BIA operations.[15] In order to achieve this end, it was recognized that some kind of preference and exemption from otherwise prevailing civil service requirements was necessary.[16] Congressman Howard, the House sponsor, expressed the need for the preference:

> "The Indians have not only been thus deprived of civic rights and powers, but they have been largely

[13] Hearings on H. R. 7902, Readjustment of Indian Affairs, before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 1–7 (1934) (hereafter House Hearings). See also *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 152–153, n. 9 (1973).

[14] House Hearings 491–497.

[15] "[Section 12] was intended to integrate the Indian into the government service connected with the administration of his affairs. Congress was anxious to promote economic and political self-determination for the Indian." *Mescalero Apache Tribe* v. *Hickel*, 432 F. 2d, at 960 (footnote omitted).

[16] "The bill admits qualified Indians to the position [*sic*] in their own service.

"Thirty-four years ago, in 1900, the number of Indians holding regular positions in the Indian Service, in proportion to the total of positions, was greater than it is today.

"The reason primarily is found in the application of the generalized civil service to the Indian Service, and the consequent exclusion of Indians from their own jobs." House Hearings 19 (memorandum dated Feb. 19, 1934, submitted by Commissioner Collier to the Senate and House Committees on Indian Affairs).

deprived of the opportunity to enter the more important positions in the service of the very bureau which manages their affairs. Theoretically, the Indians have the right to qualify for the Federal civil service. In actual practice there has been no adequate program of training to qualify Indians to compete in these examinations, especially for technical and higher positions; and even if there were such training, the Indians would have to compete under existing law, on equal terms with multitudes of white applicants. . . . The various services on the Indian reservations are actually local rather than Federal services and are comparable to local municipal and county services, since they are dealing with purely local Indian problems. It should be possible for Indians with the requisite vocational and professional training to enter the service of their own people without the necessity of competing with white applicants for these positions. This bill permits them to do so." 78 Cong. Rec. 11729 (1934).

Congress was well aware that the proposed preference would result in employment disadvantages within the BIA for non-Indians.[17] Not only was this displacement unavoidable if room were to be made for Indians, but it was explicitly determined that gradual replacement of non-Indians with Indians within the Bureau was a desirable feature of the entire program for self-govern-

---

[17] Congressman Carter, an opponent of the bill, placed in the Congressional Record the following observation by Commissioner Collier at the Committee hearings:

"[W]e must not blind ourselves to the fact that the effect of this bill if worked out would unquestionably be to replace white employees by Indian employees. I do not know how fast, but ultimately it ought to go very far indeed." 78 Cong. Rec. 11737 (1934).

ment.[18]   Since 1934, the BIA has implemented the preference with a fair degree of success.   The percentage of Indians employed in the Bureau rose from 34% in 1934 to 57% in 1972.   This reversed the former downward trend, see n. 16, *supra,* and was due, clearly, to the presence of the 1934 Act.   The Commissioner's extension of the preference in 1972 to promotions within the BIA was designed to bring more Indians into positions of responsibility and, in that regard, appears to be a logical extension of the congressional intent. ˙ See *Freeman* v. *Morton,* 162 U. S. App. D. C. 358, 499 F. 2d 494 (1974), and n. 5, *supra.*

### III

It is against this background that we encounter the first issue in the present case: whether the Indian preference was repealed by the Equal Employment Opportunity Act of 1972.   Title VII of the Civil Rights Act of 1964, 78 Stat. 253, was the first major piece of federal legislation prohibiting discrimination in *private* employment on the basis of "race, color, religion, sex, or national origin."   42 U. S. C. § 2000e–2 (a).   Significantly, §§ 701 (b) and 703 (i) of that Act explicitly exempted from its coverage the preferential employment of Indians by Indian tribes or by industries located on or near Indian reservations.   42 U. S. C. §§ 2000e (b) and 2000e–2 (i).[19]   This exemption reveals a clear congressional

---

[18] "It should be possible for Indians to enter the service of their own people without running the gauntlet of competition with whites for these positions.   Indian progress and ambition will be enormously strengthened as soon as we adopt the principle that the Indian Service shall gradually become, in fact as well as in name, an Indian service predominantly in the hands of educated and competent Indians."   *Id.,* at 11731 (remarks of Cong. Howard).

[19] Section 701 (b) excludes "an Indian Tribe" from the Act's definition of "employer."   Section 703 (i) states:

"Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any

recognition, within the framework of Title VII, of the unique legal status of tribal and reservation-based activities. The Senate sponsor, Senator Humphrey, stated on the floor by way of explanation:

"This exemption is consistent with the Federal Government's policy of encouraging Indian employment and with the special legal position of Indians." 110 Cong. Rec. 12723 (1964).[20]

The 1964 Act did not specifically outlaw employment discrimination by the Federal Government.[21] Yet the mechanism for enforcing longstanding Executive Orders forbidding Government discrimination had proved ineffective for the most part.[22] In order to remedy this, Congress, by the 1972 Act, amended the 1964 Act and

publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation."

[20] Senator Mundt supported these exemptions on the Senate floor by claiming that they would allow Indians "to benefit from Indian preference programs now in operation or later to be instituted." 110 Cong. Rec. 13702 (1964).

[21] The 1964 Act, however, did contain a proviso, expressed in somewhat precatory language:

"That it shall be the policy of the United States to insure equal employment opportunities for Federal employees without discrimination because of race, color, religion, sex or national origin." 78 Stat. 254.

This statement of policy was re-enacted as 5 U. S. C. § 7151, 80 Stat. 523 (1966), and the 1964 Act's proviso was repealed, id., at 662.

[22] "This disproportionatte [sic] distribution of minorities and women throughout the Federal bureaucracy and their exclusion from higher level policy-making and supervisory positions indicates the government's failure to pursue its policy of equal opportunity.

"A critical defect of the Federal equal employment program has been the failure of the complaint process. That process has impeded rather than advanced the goal of the elimination of discrimination in Federal employment. . . ." H. R. Rep. No. 92–238, on H. R. 1746, pp. 23–24 (1971).

proscribed discrimination in most areas of federal employment. See n. 6, *supra*. In general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government. As stated in the House Report:

> "To correct this entrenched discrimination in the Federal service, it is necessary to insure the effective application of uniform, fair and strongly enforced policies. The present law and the proposed statute do not permit industry and labor organizations to be the judges of their own conduct in the area of employment discrimination. There is no reason why government agencies should not be treated similarly. . . ." H. R. Rep. No. 92–238, on H. R. 1746, pp. 24–25 (1971).

Nowhere in the legislative history of the 1972 Act, however, is there any mention of Indian preference.

Appellees assert, and the District Court held, that since the 1972 Act proscribed racial discrimination in Government employment, the Act necessarily, albeit *sub silentio*, repealed the provision of the 1934 Act that called for the preference in the BIA of one racial group, Indians, over non-Indians:

> "When a conflict such as in this case, is present, the most recent law or Act should apply and the conflicting Preferences passed some 39 years earlier should be impliedly repealed." Brief for Appellees 7.

We disagree. For several reasons we conclude that Congress did not intend to repeal the Indian preference and that the District Court erred in holding that it was repealed.

First: There are the above-mentioned affirmative provisions in the 1964 Act excluding coverage of tribal em-

548

ployment and of preferential treatment by a business or enterprise on or near a reservation. 42 U. S. C. §§ 2000e (b) and 2000e–2 (i). See n. 19, *supra*. These 1964 exemptions as to private employment indicate Congress' recognition of the longstanding federal policy of providing a unique legal status to Indians in matters concerning tribal or "on or near" reservation employment. The exemptions reveal a clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed. In extending the general anti-discrimination machinery to federal employment in 1972, Congress in no way modified these private employment preferences built into the 1964 Act, and they are still in effect. It would be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference. Appellees' assertion that Congress implicitly repealed the preference as racially discriminatory, while retaining the 1964 preferences, attributes to Congress irrationality and arbitrariness, an attribution we do not share.

Second: Three months after Congress passed the 1972 amendments, it enacted two *new* Indian preference laws. These were part of the Education Amendments of 1972, 86 Stat. 235, 20 U. S. C. §§ 887c (a) and (d), and § 1119a (1970 ed., Supp. II). The new laws explicitly require that Indians be given preference in Government programs for training teachers of Indian children. It is improbable, to say the least, that the same Congress which affirmatively approved and enacted these additional and similar Indian preferences was, at the same time, con-

demning the BIA preference as racially discriminatory. In the total absence of any manifestation of supportive intent, we are loathe to imply this improbable result.

Third: Indian preferences, for many years, have been treated as exceptions to Executive Orders forbidding Government employment discrimination.[23] The 1972 extension of the Civil Rights Act to Government employment is in large part merely a codification of prior anti-discrimination Executive Orders that had proved ineffective because of inadequate enforcement machinery. There certainly was no indication that the substantive proscription against discrimination was intended to be any broader than that which previously existed. By codifying the existing anti-discrimination provisions, and by providing enforcement machinery for them, there is no reason to presume that Congress affirmatively intended to erase the preferences that previously had co-existed with broad anti-discrimination provisions in Executive Orders.

Fourth: Appellees encounter head-on the "cardinal rule . . . that repeals by implication are not favored." *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936); *Wood* v. *United States,* 16 Pet. 342–343, 363 (1842); *Universal Interpretive Shuttle Corp.* v. *Washington*

---

[23] See, *e. g.,* Exec. Order No. 7423, July 26, 1936, 1 Fed. Reg. 885–886, 3 CFR 189 (1936–1938 Comp.). When President Eisenhower issued an Order prohibiting discrimination on the basis of race in the civil service, Exec. Order No. 10577, § 4.2, Nov. 22, 1954, 19 Fed. Reg. 7521, 3 CFR 218 (1954–1958 Comp.), he left standing earlier Executive Orders containing exceptions for the Indian service. *Id.,* § 301. See also 5 CFR § 213.3112 (a) (7), which provides a civil service exemption for:

"All positions in the Bureau of Indian Affairs and other positions in the Department of the Interior directly and primarily related to the providing of services to Indians when filled by the appointment of Indians who are one-fourth or more Indian blood."

See also 5 CFR § 213.3116 (b) (8) (Indian Health Services).

*Metropolitan Area Transit Comm'n,* 393 U. S. 186, 193 (1968). They and the District Court read the congressional silence as effectuating a repeal by implication. There is nothing in the legislative history, however, that indicates affirmatively any congressional intent to repeal the 1934 preference. Indeed, as explained above, there is ample independent evidence that the legislative intent was to the contrary.

This is a prototypical case where an adjudication of repeal by implication is not appropriate. The preference is a longstanding, important component of the Government's Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem. Any perceived conflict is thus more apparent than real.

In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable. *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 456–457 (1945). Clearly, this is not the case here. A provision aimed at furthering Indian self-government by according an employment preference within the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by formalistic reasoning that ignores both the history and purposes of the preference and the unique legal relationship between the Federal Government and tribal Indians.

Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general

one, regardless of the priority of enactment. See, *e. g.,* *Bulova Watch Co.* v. *United States,* 365 U. S. 753, 758 (1961); *Rodgers* v. *United States,* 185 U. S. 83, 87–89 (1902).

The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . The intention of the legislature to repeal 'must be clear and manifest.' " *United States* v. *Borden Co.,* 308 U. S. 188, 198 (1939). In light of the factors indicating no repeal, we simply cannot conclude that Congress consciously abandoned its policy of furthering Indian self-government when it passed the 1972 amendments.

We therefore hold that the District Court erred in ruling that the Indian preference was repealed by the 1972 Act.

## IV

We still must decide whether, as the appellees contend, the preference constitutes invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment. *Bolling* v. *Sharpe,* 347 U. S. 497 (1954). The District Court, while pretermitting this issue, said: "[W]e could well hold that the statute must fail on constitutional grounds." 359 F. Supp., at 591.

Resolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a "guardian-ward" status, to legislate on behalf of federally recognized Indian tribes. The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and im-

plicitly from the Constitution itself. Article I, § 8, cl. 3, provides Congress with the power to "regulate Commerce . . . with the Indian Tribes," and thus, to this extent, singles Indians out as a proper subject for separate legislation. Article II, § 2, cl. 2, gives the President the power, by and with the advice and consent of the Senate, to make treaties. This has often been the source of the Government's power to deal with the Indian tribes. The Court has described the origin and nature of the special relationship:

"In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity, the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic. . . ." *Board of County Comm'rs* v. *Seber,* 318 U. S. 705, 715 (1943).

See also *United States* v. *Kagama,* 118 U. S. 375, 383–384 (1886).

Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U. S. C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized. See

*Simmons* v. *Eagle Seelatsee,* 244 F. Supp. 808, 814 n. 13 (ED Wash. 1965), aff'd, 384 U. S. 209 (1966).

It is in this historical and legal context that the constitutional validity of the Indian preference is to be determined. As discussed above, Congress in 1934 determined that proper fulfillment of its trust required turning over to the Indians a greater control of their own destinies. The overly paternalistic approach of prior years had proved both exploitative and destructive of Indian interests. Congress was united in the belief that institutional changes were required. An important part of the Indian Reorganization Act was the preference provision here at issue.

Contrary to the characterization made by appellees, this preference does not constitute "racial discrimination." Indeed, it is not even a "racial" preference.[24]

---

[24] The preference is not directed towards a "racial" group consisting of "Indians"; instead, it applies only to members of "federally recognized" tribes. This operates to exclude many individuals who are racially to be classified as "Indians." In this sense, the preference is political rather than racial in nature. The eligibility criteria appear in 44 BIAM 335, 3.1:

".1 Policy—An Indian has preference in appointment in the Bureau. To be eligible for preference in appointment, promotion, and training, an individual must be one-fourth or more degree Indian blood and be a member of a Federally-recognized tribe. It is the policy for promotional consideration that where two or more candidates who meet the established qualification requirements are available for filling a vacancy, if one of them is an Indian, he shall be given preference in filling the vacancy. In accordance with the policy statement approved by the Secretary, the Commissioner may grant exceptions to this policy by approving the selection and appointment of non-Indians, when he considers it in the best interest of the Bureau.

"This program does not restrict the right of management to fill positions by methods other than through promotion. Positions may be filled by transfers, reassignment, reinstatement, or initial appointment." App. 92.

Rather, it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups. It is directed to participation by the governed in the governing agency. The preference is similar in kind to the constitutional requirement that a United States Senator, when elected, be "an Inhabitant of that State for which he shall be chosen," Art. I, § 3, cl. 3, or that a member of a city council reside within the city governed by the council. Congress has sought only to enable the BIA to draw more heavily from among the constituent group in staffing its projects, all of which, either directly or indirectly, affect the lives of tribal Indians. The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion. See n. 24, *supra*. In the sense that there is no other group of people favored in this manner, the legal status of the BIA is truly *sui generis*.[25] Furthermore, the preference applies only to employment in the Indian service. The preference does not cover any other Government agency or activity, and we need not consider the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations. Here, the preference is reasonably and directly related to a legitimate, nonracially based goal. This is the principal characteristic that generally is absent from proscribed forms of racial discrimination.

On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular

---

[25] Senator Wheeler described the BIA as "an entirely different service from anything else in the United States." Hearings on S. 2755 and S. 3645 before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 2, p. 256 (1934).

and special treatment. See, *e. g., Board of County Comm'rs* v. *Seber,* 318 U. S. 705 (1943) (federally granted tax immunity); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973) (same); *Simmons* v. *Eagle Seelatsee,* 384 U. S. 209 (1966), aff'g 244 F. Supp. 808 (ED Wash. 1965) (statutory definition of tribal membership, with resulting interest in trust estate); *Williams* v. *Lee,* 358 U. S. 217 (1959) (tribal courts and their jurisdiction over reservation affairs). Cf. *Morton* v. *Ruiz,* 415 U. S. 199 (1974) (federal welfare benefits for Indians "on or near" reservations). This unique legal status is of long standing, see *Cherokee Nation* v. *Georgia,* 5 Pet. 1 (1831); *Worcester* v. *Georgia,* 6 Pet. 515 (1832), and its sources are diverse. See generally U. S. Dept. of Interior, Federal Indian Law (1958); Comment, The Indian Battle for Self-Determination, 58 Calif. L. Rev. 445 (1970). As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed. Here, where the preference is reasonable and rationally designed to further Indian self-government, we cannot say that Congress' classification violates due process.

The judgment of the District Court is reversed and the cases are remanded for further proceedings consistent with this opinion.

<div align="right">

*It is so ordered.*