August 22, 1978

## 78-47 MEMORANDUM OPINION FOR THE GENERAL COUNSEL, GENERAL SERVICES ADMINISTRATION

### Federal Excess Personal Property—Disposition Under § 608 of the Foreign Assistance Act of 1961 (22 U.S.C. § 2358)—Effect of 40 U.S.C. § 483(d)

This responds to your request for our opinion as to how § 3(d) of Pub. Law No. 94-519,[1] 90 Stat. 2454, 40 U.S.C. § 483(d), affects Federal excess personal property disposition under § 608 of the Foreign Assistance Act of 1961, 75 Stat. 442, as amended, 22 U.S.C. § 2358. You contend that § 3(d) governs the disposition of such property in connection with both grants and loans made by the Agency for International Development (AID) under § 608. AID contends that § 3(d) governs only grants. We conclude that AID's contention is correct.

The Federal Property and Administrative Services Act of 1949, 63 Stat. 377, as amended, 40 U.S.C. § 471 *et seq.*, regulates the use and disposal of Federal excess and surplus property. Excess property is property not required by a Federal Agency for its needs and the discharge of its responsibilities. 40 U.S.C. § 472(e). General Services Administration (GSA) is required to make an Agency's excess property known to other Agencies for possible further use within the Federal Government. If no Agency requests the property it becomes surplus, *i.e.*, "excess property not required for the needs and discharge of the responsibilities of all Federal agencies." 40 U.S.C. § 472(g).

---

[1] Public Law No. 94-519 amended the Federal Property and Administrative Services Act. Section 3(d) relates only to personal property. Accordingly, all references to property herein are to personal property, not real property.

Section 3(d) provides that Federal Agencies may not furnish excess personal property to their grantees except pursuant to its provisions.[2] It allows Agencies to furnish such property only to public agencies and nonprofit tax-exempt organizations under the conditions set forth therein.

Excess property furnished pursuant to § 608 is exempted from these conditions. However, such transfers may be made only insofar as the Administrator of General Services determines that the property is not needed for donation pursuant to § 203(j) of the Federal Property and Administrative Services Act, 40 U.S.C. § 484(j).[3]

Section 608 authorizes establishment of a $5 million revolving fund for AID to acquire excess Government property for use in "United States-assisted projects and programs." Regarding the nature of the assistance to be provided under this fund, § 635(a), 22 U.S.C. § 2395(a), reads, in pertinent part, as follows:

> Except as otherwise specifically provided in this Act [the Foreign Assistance Act], assistance under this Act may be furnished on a grant basis or on such terms, including cash, credit, or other terms of repayment . . . as may be determined to be best suited to the achievement of the purposes of this Act, and shall emphasize loans rather than grants wherever possible.

---

[2]The text of § 3(d) reads, in pertinent part, as follows:

Notwithstanding any other provisions of law, Federal agencies are prohibited from obtaining excess personal property for purposes of furnishing such property to *grantees* of such agencies except as follows:

(1) Under such regulations as the Administrator [of General Services] may prescribe, any Federal agency may obtain excess personal property for purposes of furnishing it to any institution or organization which is a public agency or is nonprofit and exempt from taxation under section 501 of the Internal Revenue Code of 1954, and which is conducting a federally sponsored project pursuant to a grant made for a specific purpose with a specific termination made: Provided, that—

(A) such property is to be furnished for *use in connection with the grant;* and

(B) the sponsoring Federal agency pays an amount equal to 25 percentum of the original acquisition cost (except for costs of care and handling) of the excess property furnished, such funds to be covered into the Treasury as miscellaneous receipts.

\* \* \* \* \*

(2) Under such regulations and restrictions as the Administrator [of General Services] may prescribe, the provisions of this subsection shall not apply to the following:

(A) *property furnished under section 608 of the Foreign Assistance Act of 1961, as amended, where and to the extent that the Administrator of General Services determines that the property to be furnished under such Act is not needed for donation pursuant to section 203(j) [40 U.S.C. § 484(j)] of this Act;*

\* \* \* \* \*

This paragraph shall not preclude any Federal agency [from] obtaining property and furnishing it to a *grantee* of that agency under paragraph (1) of this subsection. [Emphasis added.]

[3]This provision regulates the donation of surplus property to the States, territories, and possessions.

The use of excess property is encouraged in foreign assistance programs. Section 102(a) of the Foreign Assistance Act, 22 U.S.C. § 2151(a), reads in pertinent part, ". . . to the maximum extent practicable . . . disposal of excess property . . . undertaken pursuant to this or any other Act, shall complement and be coordinated with [international development] assistance . . .." Thus, the use of excess property is sanctioned in § 608 loan and grant programs. Further, the legislative history of § 608 states that as excess property is used, the revolving fund is to be "replenished from the appropriation applicable to the particular purpose of the assistance, *i.e., development loans, development grants, supporting assistance, etc.*" S. Rept. No. 612, 87th Cong., 1st sess. 30 (1961). [Emphasis added.]

AID informs us that foreign countries acquire excess property under § 608 by paying part of the moneys they receive under the foreign assistance programs into the revolving fund. Thus, in those cases, the amount of monetary assistance is decreased depending on the cost of the excess property acquired. The acquisition of excess property by this method is particularly beneficial to foreign countries because they are only charged with the costs of administration, rehabilitation of the property, handling, etc. *See, Hearings on AID's Excess Property Program before a Subcommittee of the House Committee on* Government Operations, 91st Cong., 2d sess. 13-16 (1970) (1970 Hearing). Thus, since excess property can be acquired for substantially less than new property, foreign assistance spending power is increased. This has been referred to as "stretching the foreign aid dollars." *See, 1970 Hearing* at 14, 24. As indicated above, both foreign loan and grant programs may use excess property.

Under § 608(b) excess property not exceeding $45 million (acquisition cost) may be transferred to AID each fiscal year without GSA approval. However, with respect to property exceeding that amount, GSA must first determine that it is not needed for donation pursuant to § 203(j).

The difference between AID's and GSA's interpretations of § 3(d) is that under GSA's view AID may transfer excess property under either § 608's loan or grant programs only if GSA first determines that the property is not needed for donation pursuant to § 203(j). While AID agrees with regard to § 608 grants, it contends that GSA has no role in excess property transfers in § 608 loan transactions unless these transactions involve more than $45 million (original acquisition cost) of excess property in any fiscal year.

GSA advances two arguments to support its interpretation. First, it asserts that a principal purpose of § 3(d) is to provide as much property as possible for use by the States. Therefore, it concludes, it would be inconsistent with this purpose to read the law as not controlling excess property disposition in § 608 loan transactions. It further argues that:

> It is difficult to discern whether there is any difference between AID's grant program and their development loan program in the use of excess property because in both instances the property is given to the foreign recipients.

However, GSA ignores the plain language and the legislative history of § 3(d). That provision expressly deals only with excess property transfers to *grantees* of Federal Agencies. Section 608's loan program deals with borrowers, not grantees. Moreover, § 3(d)'s legislative history shows that it was primarily intended to regulate the Agency's practice of lending excess property to organizations receiving grants. H. Rept. No. 94-1429, 94th Cong., 2d sess. 3-4 (1976); S. Rept. No. 94-1323, 94th Cong., 2d sess. 4-6 (1976). The foregoing reports expressed concern that this practice withdrew from circulation property that otherwise would have been eventually used in surplus property programs. H. Rept. No. 94-1429, *supra*, at 7; S. Rept. No. 94-1323, *supra*, at 7. Plainly, Congress was concerned about property diverted from the surplus property program, but only insofar as this resulted from grantor Agencies lending excess property to their grantees. The excess property provisions of § 3(d) were primarily designed to meet this problem.[4]

There is no evidence in § 3(d)'s legislative history that Congress intended to abolish § 608's mechanism covering both loans and grants, and replace it with a mechanism for utilizing excess property in connection with loans. It is a familiar principle of statutory construction that repeals by implication are disfavored. When two statutes are capable of coexistence, both must be regarded as effective absent a clearly expressed congressional intention to the contrary. *Administrator, FAA* v. *Robertson*, 422 U.S. 255 (1975); *Morton* v. *Mancari*, 417 U.S. 535 (1974). An intention to repeal a statute must be clear and manifest. *Morton* v. *Mancari*, *supra*, at 551. This rule applies to partial repeals as well as to complete ones. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 134 (1974). Although Congress expressly restricted § 608's disposition of excess property in grant programs, there is no evidence that it also intended to so restrict excess property use in § 608's loan programs. Rather the language of § 3(d) and its legislative history point to a contrary intention. It must be assumed that Congress did not intend to alter § 608 as it applied to the use of excess property in loan programs.

We conclude that § 3(d) must be construed as affecting only the use of excess property in § 608 grant programs.

MARY C. LAWTON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[4]*See also. Recommendations of the Ad Hoc Interagency Study Group on Utilization of Excess Federal Property (1974).* reprinted in *Distribution of Federal Surplus Property to State and Local Organizations: Hearings on H.R. 9152 and H.R. 9593 Before a Subcommittee of the House* Committee on Government Operations, 94th Cong., 1st sess. 397 *et seq.* (1975). These recommendations led to the excess property provisions of Pub. L. No. 94-519. The Ad Hoc Interagency Study Group studied the practice of grantor Agencies loaning excess property to grantees. Thus, it is not unreasonable to assume that this is the problem with which § 3(d) sought to deal.