# Limitations on Presidential Authority To Control Export of Certain Hazardous Substances

The regulatory scheme imposed by certain statutes regulating specific hazardous sub-stances for purposes of health and safety does not preclude the President from imposing export controls on those substances for foreign policy purposes under the Export Administration Act (EAA).

Section 17(a) of the EAA does not supersede other laws imposing export controls, but expressly recognizes the effect of such other laws; controls under the EAA thus may exist side-by-side with controls imposed pursuant to other laws.

Insulating the vast range of products which are subject to domestic health and safety regulations from export controls would defeat the goals of the EAA relating to national security, foreign policy, and economic stability.

November 13, 1980

## MEMORANDUM OPINION FOR
## THE DEPUTY COUNSEL TO THE PRESIDENT

This responds to your request for our opinion whether other statutes limit the President's authority under the Export Administration Act of 1979 (EAA), Pub. L. No. 96–72, 93 Stat. 503 (1979), 30 U.S.C. app. § 2401 (Supp. III 1979), to control exports of hazardous substances for foreign policy purposes. Your request further pursues the subject of our memorandum of April 11, 1980, for the Special Assistant to the President for Consumer Affairs, in which we found the general authority for such export controls but added a caveat noting that we did not address the effect, if any, of other statutes regulating hazardous substances.* The General Counsel to the United States Trade Representative has since expressed his opinion in a memorandum (hereinafter Memoran-dum) that the effect of certain of these statutes is to preclude the imposition of export controls under the EAA. We disagree with this reading of the statutes; and for the reasons that follow, we conclude that the President's authority under the EAA is not so limited.

In his Memorandum, the General Counsel states his view that certain statutes currently controlling the products as to which export controls are being considered contain "express provisions" permitting exports of the products.[1] The General Counsel therefore concludes that export

---

*NOTE: The text of the April 11, 1980, memorandum appears in this volume at p. 568. Ed.
[1] The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 381(d)(1); the Public Health Service Act, 42 U.S.C. § 263f(a)(3); the Consumer Product Safety Act, 15 U.S.C. § 2067 (Supp. II 1978); the
Continued

controls under the EAA would be inconsistent with its statutory language and would intrude upon congressional authority under Article I, § 8, clause 3 of the Constitution to regulate foreign commerce. The inconsistency is asserted on the basis of § 17(a) of the EAA which provides that "[n]othing contained in this Act. . . . shall be construed to modify, repeal, supersede, or otherwise affect the provisions of any other laws authorizing control over exports of any commodity." 50 U.S.C. App. § 2416(a). By this section, the General Counsel finds that Congress has expressly excluded from controls under the EAA any commodity the export of which is provided for under any other law, including the seven specific statutes cited. And, in the face of the asserted congressional prohibition of export controls, he concludes that the Executive has no authority to regulate foreign commerce. We have examined the General Counsel's Memorandum and in our opinion none of its conclusions is correct.

I.

A. The General Counsel's Memorandum rests, at bottom, on the view that each of the seven statutes cited expressly authorizes export of the regulated products. We find no such express authorization.

The so-called export authorization cited under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 381(d)(1), provides that a food, drug, device, or cosmetic intended for export shall not be deemed to be adulterated or misbranded within the meaning of the law if it meets certain conditions for export including specification by a foreign purchaser, compliance with the laws of the importing country, and appropriate labeling. Section 381(d)(1) is thus not an express authorization of exports at all. It is nothing more than an exemption for exports from the regulatory scheme and the standards required for products intended for use in this country.

With minor differences in the requirements that must be met before the exemption from domestic standards will be available, the other cited provisions are to the same effect. Thus the Public Health Service Act requires labeling for export and compliance with the requirements of the importing country, 42 U.S.C. § 263f(a)(3) (electronic products emitting radiation); the Consumer Products Safety Act, labeling for export, no unreasonable risk to consumers within the United States, and notification to the Consumer Product Safety Commission of intent to export, 15 U.S.C. § 2067 (Supp. II 1978); the Federal Hazardous Substances Act, marking for exports, labeling in accordance with the specifications of the foreign purchaser and the laws of the foreign country, no unreasonable risk of injury to persons in the United States, and notifica-

Federal Hazardous Substances Act, 15 U.S.C. § 1264(b) (Supp. II 1978); the Flammable Fabrics Act, 15 U.S.C. § 1202 (Supp. II 1978); the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136o (Supp. II 1978); the Toxic Substances Control Act, 15 U.S.C. § 2611.

tion to the Commission, 15 U.S.C. § 1264(b) (Supp. II 1978); the Flammable Fabrics Act, labeling for export, and no unreasonable risk to persons in the United States, and notification to the Commission, 15 U.S.C. § 1202(a), (c) (Supp. II 1978); the Federal Insecticide, Fungicide, and Rodenticide Act, preparation or packaging in accordance with the specifications of the foreign purchaser and, if applicable, a signed acknowledgment by the purchaser, with a copy to an appropriate official of the importing country, that the pesticide is not registered for use in the United States and cannot be used in the United States, 7 U.S.C. § 136o(a) (Supp. II 1978); and the Toxic Substances Control Act, labeling for export, no unreasonable risk of injury to health within the United States or to the environment of the United States, and in some cases notification to the Administrator of the Environmental Protection Agency of intent to export, 15 U.S.C. § 2611.

Nowhere in any of the above-referenced provisions is there any indication of an intent to confer an *absolute* right to export without regard to any other provisions of law.[2] There is merely an exemption from the domestic standards that would otherwise apply.[3]

B. In the absence of any express authorization for exports under these statutes, the further argument in the Memorandum as to the effect of § 17(a) of the EAA has not even the basis asserted therein. The continuing relevance of other laws providing for export, as § 17(a) is said to recognize, depends first on a finding that other laws in fact provide, in so many words, for export. We have concluded that the cited statutes do not. But even if they did, the effect of § 17(a) would not be to preclude controls under the EAA. The assertion in the Memorandum to the contrary greatly distorts the language of § 17(a).

First, § 17(a) does not address, as the Memorandum asserts, the relationship between the EAA and other laws that provide for export. Section 17(a), in fact, addresses the relationship between the EAA and laws that do affirmatively provide, just to the contrary, for export controls. The seven statutes cited cannot be at the same time laws expressly authorizing exports and laws authorizing controls over ex-

---

[2] In fact, § 2 of the Senate version of the EAA, which contained references to the "right of export," was amended to substitute the word "ability" for the word "right," *see* 50 U.S.C. App. § 2401(1), specifically to avoid the inference of "a constitutional or otherwise legally enforceable right to export free from government restriction." S. Rep. No. 169, 96th Cong., 1st Sess. 3–4 (1979) (hereinafter cited as "1979 Senate Report"). If any of these seven statutes had conferred a right to export, we think that it would have been mentioned at this point.

[3] Given the clarity of the language, we need not review the legislative history of the EAA, although we do note that there is no indication in the history that any of these seven statutes is an export control law. The House report states only that "[t]he Export Administration Act of 1969 constitutes the basic authority for controlling the export of most civilian products from the United States. (Related acts are the Arms Export Control Act, pertaining to the export of arms, ammunition, and implements of war, and the Nuclear Non-Proliferation Act of 1978, pertaining to the export of nuclear materials and technology.)" H.R. Rep. No. 200, 96th Cong., 1st Sess. 2–3 (1979) (hereinafter cited as "1979 House Report"). We also have no need to rely upon, although again we certainly do note, the well-settled rule that repeals by implication are not favored. *See, e.g., Morton* v. *Mancari,* 417 U.S. 535, 549 (1974).

ports. Second, § 17(a) does not address, as the Memorandum asserts, the effect on further controls under the EAA even as to commodities that are controlled under other laws. Again, § 17(a) is addressed to just the contrary situation. The relationship is stated not in terms of the effect on controls under the EAA but in terms of controls under these other laws. And third, even as to these other laws, the effect is just the contrary of that stated in the Memorandum. Section 17(a) is not a preclusion of further controls· at all. Instead, it expressly recognizes the effect of other controls.

C. With this statutory construction, the constitutional argument in the Memorandum also falls. The assertion that the Executive may regulate commerce only as Congress has provided, and thus may not take actions that Congress has expressly forbidden, is meaningless in the context of the EAA, which not only does not forbid the export controls contemplated here but in fact expressly authorizes them.[4]

## II.

There are other significant reasons for our opinion that the regulatory scheme of the seven cited statutes does not preclude export controls for foreign policy purposes under the EAA. The argument to the contrary ignores the history of § 17(a), fails to take account of the effect of the argument on national security and short-supply controls, and represents a fundamental misunderstanding of the purpose and function of the EAA.

A. The provision that is now § 17(a) derives from § 10 of the Export Control Act of 1949, which provided:

> The Act of February 15, 1936 (49 Stat. 1140), relating to the licensing of exports of tinplate scrap, is hereby superseded; but nothing contained in this Act shall be construed to modify, repeal, supersede, or otherwise affect the provisions of any other laws authorizing control over exports of any commodity.

Pub. L. No. 81–11, § 10, 63 Stat. 7, 9 (1949). The legislative history of § 10 makes clear both the reason for the change in the law relating to tinplate scrap and the fact that no other changes in existing export control laws were made. Under prior law, the export licensing authority for tinplate scrap was conferred upon the Department of State but was, in practice, handled by the Department of Commerce. Section 10 had the effect of transferring the licensing authority to the agency that would administer the 1949 Act and also conforming the law to the prior practice. S. Rep. No. 31, 81st Cong., 1st Sess. 7 (1949). Yet there

---

[4] We do not wish to be understood as conceding, however, that the Executive has no independent constitutional authority to regulate commerce for foreign policy reasons. Because the EAA clearly confers this authority by statute, we have no need to consider the constitutional question.

were in effect at the time of the 1949 Act export controls on other commodities, such as narcotics, gold, ammunition, arms, implements of war, tobacco seed, and atomic energy materials, H.R. Rep. No. 18, 81st Cong., 1st Sess. 12 (1949); the Senate report, *supra,* mentions helium also. As to these, "the bill makes no change whatever in the present laws." S. Rep. No. 31, *supra; see also* H.R. Rep. No. 18, *supra.*

The Export Administration Act of 1969, Pub. L. No. 91–184, § 12(a), 83 Stat. 841, 846 (1969), retained verbatim the language of § 10. The 1979 Act deleted the language expressly superseding the prior law as to tinplate scrap but retained the language continuing the effectiveness of other laws authorizing control over exports. There is no explanation in the legislative history why the 1969 Act carried over the reference to tinplate scrap or why the 1979 Act deleted it, but the process is in any event not relevant to the issue here. What is important is that the 1979 Act retained in § 17(a) that portion of the prior provisions clearly stating the legislative intent that the EAA did not replace the regulatory authority existing pursuant to other laws.

By its literal terms, § 17(a) goes no further. As we noted above in discussing the construction given to § 17(a) in the Memorandum, the section does not address the effect, if any, of this other regulatory authority on the authority under the EAA. But in preserving the authority to impose controls pursuant to other laws, § 17(a), like its predecessors, creates a regulatory structure in which export controls under these other laws exist side by side with controls under the EAA. At least in the absence of any indication to the contrary in these other statutes, the reasonable conclusion to be drawn from the history of § 17(a), and the logical implication of the regulatory structure that results, is that controls under the EAA also may exist side by side with these other controls. As we discuss at length above, we find no such contrary indication in any of the seven statutes cited.

The Memorandum is addressed only to export controls imposed for foreign policy purposes. But the EAA also provides authority to impose controls in the interests of national security, or to prevent undue diminution of goods in short supply, 50 U.S.C. App. §§ 2404, 2406. The authority as to national security controls is conferred in furtherance of the congressionally declared policy of using export controls "to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States." 50 U.S.C. App. § 2402(2)(A). As to short-supply controls, the export control authority is intended to implement the policy of using export controls "to protect the domestic economy from the excessive drain of scarce materials and to reduce the serious inflationary impact of foreign demand." 50 U.S.C. App. § 2402(2)(C).

B. The Memorandum does not discuss the effect of § 17(a) on these national security or short-supply controls, but there is nothing in § 17(a) that would limit to foreign policy controls the effect attributed to that provision in the Memorandum. Under that interpretation, national security. controls would be precluded merely because another statute imposed health and safety regulations on domestic distribution of a particular product but utilized a more lenient standard for exports. For this is all that the seven cited provisions do; and this, of course, protects the national security not at all. A health-and-safety regulatory scheme that included different standards for domestic distribution and export would similarly preclude short-supply export controls even though the other statute protected the national economy not at all. This interpretation of § 17(a) cannot be squared with the clear legislative intent as expressed in the congressional declarations of policy.[5]

C. In the final analysis, this result is the clearest indication that the view in the Memorandum must be rejected. In pursuit of national security, foreign policy, and economic stability, the EAA was intended to provide comprehensive authority for the control of exports. Nothing less would meet the stated goals of increasing the emphasis on national security, 1979 Senate Report at 4, and implementing "the full range of U.S. foreign policy goals," H.R. Rep. No. 482, 96th Cong., 1st Sess. 43 (1979) (1979 Conference Report) while at the same time minimizing uncertainty in export policy, increasing the efficiency of applicable administrative procedures, obtaining increased cooperation by our allies, and providing the Executive with the flexibility to react promptly and appropriately to extreme and varied situations. *See* 1979 Senate Report at 2–3, 8; 1979 House Report at 4–5; 1979 Conference Report at 43. Insulating a vast range of products from export controls would in one stroke defeat these goals and prevent any kind of a comprehensive and consistent export policy. And, as increased concern about health and safety requires expanded domestic regulation of hazardous substances, this approach would force the Executive to choose, on the one hand, between forgoing domestic .regulation (or seeking in the course of such regulation export standards identical in all circumstances to domestic standards) or, on the other hand, retaining the authority to control exports as appropriate under the EAA. We cannot believe that Congress intended to force such a choice. The legislative history and the statements of findings and policy in the EAA are at odds with this interpretation and indicate instead that, where export

---

[5] One additional indication that these health-and-safety regulations do not preclude the imposition of export controls under the EAA is the inclusion of § 6(f) of the Act, which provides that the EAA does not authorize controls on medicine or medical supplies, 50 U.S.C. App. § 2405(f). Although the products that fall within this exclusion might not be identical to those regulated under the Federal Food, Drug, and Cosmetic Act there is clearly some overlap. If 21 U.S.C. § 381(d)(1) had the effect that the Memorandum contends it has, § 6(f) would have been either omitted as unnecessary or at least phrased with reference to § 381(d)(1).

controls under the EAA become important for reasons of national security, foreign policy, or short domestic supplies, the President would have the authority, notwithstanding any other statute that allows exports in the absence of one of these reasons, to impose those controls.

For all the foregoing reasons, we reject the view in the Memorandum that the seven statutes cited preclude the imposition of export controls pursuant to the EAA. We find no such preclusion and find instead the President's continuing authority under the EAA to control exports as appropriate.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*