SLOVITER, Circuit Judge,
Dissenting.
In 1974, Congress enacted the Real Estate Settlement Procedures Act (“RES-PA”), 12 U.S.C. §§ 2601-2617, to govern the procedures to be followed in connection with escrow accounts established to ensure the payment of real estate taxes and insurance. When there has been a default, RESPA authorizes a loan servicer to estimate the property taxes and insurance that will be due over the ensuing twelve months and to adjust the borrower’s monthly escrow payments under the mortgage to cover the estimated expenses, subject to certain limitations. See id. § 2609(a)(l)-(2).[1] Regulation X, RESPA’s implementing regulation, also allows a loan servicer to conduct the analysis at the inception of the loan, at the end of each computation year, or “at other times during the escrow computation year.” 24 C.F.R. § 3500.17(f)(1)(ii). As part of this procedure, RESPA and Regulation X authorize a servicer to “require the borrower to pay additional deposits to make up the shortage or eliminate the deficiency” in an escrow account. Id., see also 12 U.S.C. § 2609(a)(2). A “deficiency” is “the amount of a negative balance in an escrow account.” 24 C.F.R. § 3500.17(b). A “shortage” is “an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis.” Id.
In its opinion on the Debtors’ appeal, the District Court noted: “[T]he parties agree [that as of the petition date,] the Debtors’ [the Rodriguezes’] escrow account was actually deficient by $3,869 — the total amount Countrywide paid for property taxes and insurance on behalf of Debtors in excess of the funds Debtors actually deposited into their escrow account.” In re Rodriguez, No. 08-5207, slip op. at 2 (D.N.J. May 11, 2009). Consistent with the requirements of the Bankruptcy Act, Countrywide included that amount in its proof of claim, and then recalculated the remainder of the escrow precisely as provided under RE SPA.
For purposes of the forward-looking calculation, Countrywide treated the Rodriguezes’ escrow account as having a zero balance on the Petition Date. Because of the Rodriguezes’ failure to keep the required escrow payments current, Countrywide set the Rodriguezes’ post-petition escrow payment at $947.77, which reflected a *144 monthly increase $240.57 over their prepetition escrow payment of $707.20.[2] The higher payment as authorized by Regulation X was intended to avoid the escrow shortage that would have occurred as taxes and insurance became due over the ensuing twelve months.[3]
In discussing RESPA, the Bankruptcy Court stated:
[A] lender must estimate future property taxes and assessments, as well as insurance premiums, and allocate the estimated sum over a period sufficient to provide adequate funds to pay the escrow charges when due. This right is limited by RESPA which proscribes lenders from requiring a borrower to deposit in any escrow account an aggregate sum which exceeds the amount sufficient to pay taxes, insurance premiums and other charges with respect to the property during the ensuing twelvemonth period, plus one-sixth of the estimated total of such amounts. 12 U.S.C. § 2609(a). This limitation, however, is subject to exception. If the lender determines that a deficiency exists, the lender may require the borrower to make additional monthly deposits into the escrow account to remedy such deficiency, but must notify the borrower of any shortage of funds. 12 U.S.C. § 2609(a)(2), (b). Upon the borrower’s payment of the escrow amounts, the mortgage requires the lender to hold the funds in accordance with RE SPA and to apply the funds to pay the escrow charges when due, but no later than the time specified under RESPA.
RESPA also authorizes lenders, like Countrywide, to calculate and collect certain “advance deposits in escrow accounts,” or shortage contributions, in order to minimize any negative balance that may occur in a borrower’s escrow account over the twelve months when Countrywide must disburse funds to protect the property (e.g. insurance, PMI payments, and taxes)[.]
In re Rodriguez, 391 B.R. 723, 727-28 (Bankr.D.N.J.2008) (footnote omitted).
The majority fails to acknowledge that Countrywide acted in accordance with RESPA. On the other hand, the Bankruptcy Court correctly noted that:
Debtors ... fail to explain satisfactorily why such rights afforded lenders under RESPA should be abrogated in the context of a Chapter 13 bankruptcy proceeding. Debtors’ required shortage contribution is a charge authorized by and calculated in accordance with RES-PA, as well as the underlying loan agreement....
Id. at 729.
The majority never even tries to explain why RESPA is inapplicable. The Bankruptcy Court recognized the practical effect of the Debtors’ argument, which it rejected:
In effect, Debtors seek to have Countrywide include in its pre-petition arrear *145 age, to be paid over the life of the Chapter 13 plan, not only sums actually disbursed by Countrywide for items such as taxes and insurance, but also such additional sums the Debtors should have paid into the escrow account prior to filing. Moreover, Debtors contend that in projecting the twelve month summary balance of the Debtors’ escrow account, Countrywide should not have started at zero, but rather should have calculated the lowest projected escrow balance as if the Debtors had made the requisite pre-petition monthly payments.
Id. Of course, the Debtors never made those payments, and it made little sense to credit them for payments never made. Instead, Countrywide included in its claim the escrow amounts which it paid.
The majority posits that Countrywide should have included in its claim filed in the bankruptcy the escrow amounts not yet due (an amount the majority calculates as $1,787.69), an argument rejected by the Bankruptcy Court. That Court agreed with Countrywide’s contention that its prepetition claim should be limited to the amounts actually disbursed.
The Bankruptcy Court cogently explained why Countrywide’s analysis was correct and why the definition of “claim,” though broad, is not without limit:
A “right to payment”, as incorporated in the statutory definition of “claim” under 11 U.S.C. § 101(5) implicitly encompasses a right of retention, which is not subsumed in Countrywide’s “right to collect” escrow items. Absent sums actually expended, as permitted under the loan documents to protect its own collateral interest, Countrywide need not include pre-petition escrow arrears in its proof of claim inasmuch as the mortgage instrument only permits Countrywide to retain such funds as reimbursement to the extent of actual advances. Otherwise, Countrywide merely collects and holds such funds for payment to third parties.
Id. at 730.[4]
This conclusion is consistent with the Second Circuit’s interpretation of “claim” in In re Villarie, 648 F.2d 810, 812 (2d Cir.1981), which, contrary to the majority’s assertion, is germane. There, the court held that even though a state pension fund had the ability to deduct payments from a state employee’s paycheck in order to pay back a loan, the fund had no right to sue for the amount of the loan because the employee was, in effect, borrowing from his own retirement. Accordingly, there was no enforceable claim against the debt- or. Id. Such a conclusion is even more appropriate here because the mortgage provides no means of recovering the non-paid escrow funds. The only remedy is acceleration of payment of other sums— the sums actually secured by the mortgage. This interpretation of the meaning of a “claim” is consistent with the provisions of RESPA which authorize a lender to recalculate future escrow fund payments at a variety of junctures to ensure that shortages are covered.
Outside of bankruptcy, mortgagors with a negative escrow account can and *146 should expect to have their escrow account re-examined, in accordance with RE SPA regulations, and be assessed an additional monthly charge for the escrow shortage. No one would suggest that non-debtors could seek to have a lender calculate an escrow shortage contribution, by giving credit for missed monthly payments. Certainly, there is no reason to afford Chapter 13 debtors with such rights, and this Court finds nothing in either RESPA or the Bankruptcy Code which mandates such a result. Accordingly, this Court regards Countrywide’s approach in treating the Debtors’ escrow account as having a zero balance as logical, reasonable and supported by applicable non-bankruptcy law.
391 B.R. at 731.
The majority relies on language in the Fifth Circuit opinion in Campbell v. Countrywide Home Loans, 545 F.3d 348 (5th Cir.2008), which is arguably dicta. In any event, that decision is not binding on us.
More important is that the majority opinion sets up an irreconcilable conflict between two federal statutes, RESPA, 12 U.S.C. § 2609(a), and the Bankruptcy Code’s automatic stay, 11 U.S.C. § 362(a). Under the majority’s approach, it is difficult to foresee that any mortgage lender that seeks to recalculate escrow due in accordance with RESPA and Regulation X would not be in violation of the automatic stay. In effect the majority is abrogating RESPA. That is a serious step^ — one that a federal court should hesitate to do. As the Supreme Court has stated:
The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.
Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The majority’s opinion fails to follow the admonition of the Supreme Court in Morton as it has made no effort to accommodate its interpretation of RE SPA with that of the Bankruptcy and District Courts in this case.
For the reasons set forth, I respectfully dissent.

. Regulation X of RESPA provides for a twelve-month forward-looking analysis to determine how much money must be deposited monthly into the escrow account. See 24 C.F.R. § 3500.17(b).

. The Bankruptcy Court held that Countrywide had mistakenly included a pre-petition October 2007 tax bill in its post-petition escrow analysis and therefore recalculated the post-petition monthly shortage payment as $94.53, not $210.65, thereby reducing the total-post petition monthly payments to $831.65, not $947.77 as Countrywide originally calculated. Countrywide does not challenge this revision. In re Rodriguez, 391 B.R. 723, 731-32 (Bankr.D.NJ.2008).

. Whereas the Rodriguezes’ pre-petition escrow payment was based on a projected escrow surplus that assumed they were making their payments, the higher post-petition escrow payment was based on the shortage that would develop were the Rodriguezes to continue to pay the same monthly escrow that resulted in the escrow arrearage.

. The additional $1,787.69 the majority believes Countrywide should have included in its proof of claim bears no relationship to the monthly shortage payments Countrywide sought post-petition. Indeed, as calculated by the Bankruptcy Court, the Rodriguezes’ monthly post-petition shortage payments should be $94.53 a month. Over the course of a year, this amounts to approximately $1,134.30. 391 B.R. at 732. Perversely, under the majority's opinion, Countrywide is required, and indeed allowed, to claim $1,787.69 in Bankruptcy for the missed escrow payments, when it would have been entitled to increase the shortage payments by only $1,134.30 over the course of a year.