# United States Court of Appeals for the Federal Circuit

---

**PETER VAN DERMARK,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2021-2225

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 19-2795, Judge Coral Wong Pietsch, Judge Joseph L. Toth, Judge William S. Greenberg.

---

Decided: January 23, 2023

---

THOMAS SAUNDERS, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for claimant-appellant. Also represented by DOMINICK HURLEY, Los Angeles, CA.

MATTHEW JUDE CARHART, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by MICHAEL GRANSTON, REBECCA SARAH KRUSER, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM; ALEXANDRA RIGBY, BRYAN THOMPSON, Office of General

Counsel, United States Department of Veterans Affairs, Washington, DC.

_____

Before DYK, TARANTO, and STARK, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Peter Van Dermark is a veteran with a service-connected disability recognized by the Department of Veterans Affairs (VA). While abroad, he received medical treatment from a non-VA source for conditions not derived from that disability. By assumption here, the treatment was emergency treatment. Mr. Van Dermark filed claims with VA asking it to pay for his treatment, under 38 U.S.C. § 1728 (enacted in 1973) and § 1725 (enacted in 1999), either by paying those who treated him or by paying him (reimbursing him) for what he had paid or owed them. VA's Office of Community Care denied both claims, the Board of Veterans' Appeals maintained the denials, and the Court of Appeals for Veterans Claims (Veterans Court) affirmed the Board's decision. *Van Dermark v. McDonough*, 34 Vet. App. 204, 206 (2021).

The basis of the denial was 38 U.S.C. § 1724, which, as relevant here, took its current form in 1958, based on a 1940 statute containing the key phrase now in dispute. Specifically, the Veterans Court, like VA, relied on § 1724(a), which prohibits VA from "furnish[ing] hospital . . . care or medical services" abroad, except in limited circumstances concededly not present here. On Mr. Van Dermark's appeal, we agree with the Veterans Court that the "furnishing" phrase encompasses the payment for a veteran's hospital care or medical expenses abroad at issue here, making the § 1724(a) prohibition applicable, and that §§ 1728 and 1725 do not override that prohibition. We therefore affirm.

I

We decide the issue before us based on facts accepted by the parties for purposes of this appeal. Mr. Van Dermark served in the United States Navy from June 1963 until his honorable discharge in May 1976. VA has found Mr. Van Dermark to be totally and permanently disabled due to service-connected injuries. As relevant here, Mr. Van Dermark received treatment in Thailand (where he lived) at non-VA facilities, from physicians and others not affiliated with VA, on two occasions—first in 2016, again in 2018—both times for cardiac conditions not related to his service-connected disability. For each of the two instances of treatment abroad, Mr. Van Dermark filed a claim with VA under 38 U.S.C §§ 1728 and 1725 seeking VA payment—to him or his medical creditors—for the surgical or other heart-related treatment he received abroad.

Section 1728(a) says that the Secretary "shall . . . reimburse veterans eligible for hospital care or medical services under this chapter for the customary and usual charges of emergency treatment . . . for which such veterans have made payment, from sources other than the Department, where such emergency treatment was rendered to such veterans in need thereof" in specified circumstances. 38 U.S.C. § 1728(a).[1] One such circumstance is where the treatment is for "[a]ny disability of a veteran if the veteran has a total disability permanent in nature from a service-connected disability." *Id.* § 1728(a)(3). Section 1728 allows

---

[1]    Enacted in 1973 as 38 U.S.C. § 628 using "may," the provision was recodified as 38 U.S.C. § 1728 in 1991 (as part of the general recodification of chapter 17, changing "6xy" provisions to "17xy" provisions) and has used "shall" since 2008. *See* Pub. L. No. 93-82, § 106(a), 87 Stat. 183 (1973); Pub. L. No. 102-83, § 5(a), 105 Stat. 406 (1991) (recodification); Pub. L. No. 110-387, § 402(b)(1), 122 Stat. 4123 (2008) (replacing "may" with "shall").

the Secretary, "in lieu of reimbursing such veteran," to "make payment of the reasonable value of emergency treatment directly—(1) to the hospital or other health facility furnishing the emergency treatment; or (2) to the person or organization making such expenditure on behalf of such veteran." *Id.* § 1728(b). The section borrows the meaning of "emergency treatment" from § 1725(f)(1). *Id.* § 1728(c). Section 1728 makes no reference to treatment abroad.

Section 1725(a) says that, subject to certain conditions and limitations, the Secretary "shall reimburse a veteran described in subsection (b) for the reasonable value of emergency treatment furnished the veteran in a non-Department facility," while authorizing the same direct-payment alternative to reimbursement as does § 1728. *Id.* § 1725(a)(1), (2).[2] Section 1725(b) describes the eligible veteran as one "who is an active Department health-care participant who is personally liable for emergency treatment furnished the veteran in a non-Department facility." *Id.* § 1725(b)(1). The subsection identifies who is "an active Department health-care participant" in terms of enrollment in the VA health-care system under 38 U.S.C. § 1705(a) and recent receipt of care under chapter 17. *Id.* § 1725(b)(2). It further identifies being "personally liable" in terms that, among other things, exclude a veteran who has "entitlement to care or services under a health-plan contract" or eligibility "for reimbursement for medical care or services under section 1728." *Id.* § 1725(b)(3).[3] Section

---

[2]    Enacted in 1999 using "may," the provision has used "shall" since 2008. *See* Pub. L. No. 106-117, title I, § 111(a), 113 Stat. 1553 (1999) (enacting 38 U.S.C. § 1725); Pub. L. No. 110-387, title IV, § 402(a), 122 Stat. 4123 (2008) (changing "may" to "shall").

[3]    The term "health-plan contract" covers various insurance and other arrangements, an "insurance program"

1725(c) adds that the veteran's liability for the costs of the treatment is extinguished if the Secretary makes payment under the section on behalf of the veteran "to a provider of emergency treatment" unless the payment is "rejected and refunded by the provider within 30 days of receipt," and it makes specified contractual arrangements or their absence immaterial to the applicability of that extinguishment provision. *Id.* § 1725(c)(3). Like § 1728, § 1725 makes no reference to treatment abroad.

Mr. Van Dermark contended that he was entitled to the claimed payment because the treatment he received in 2016 and 2018 in Thailand constituted "emergency treatment" under §§ 1728 and 1725. He claimed eligibility for payment under § 1728 because of his total-disability rating and under § 1725 because he was an active VA healthcare participant with recent enough receipt of VA care. VA's Office of Community Care and the Board denied both claims, applying § 1724(a)'s prohibition on VA's "furnish[ing] hospital care and medical services" "outside any State" where, as is undisputed here, the exceptions stated in § 1724 do not apply (because the treated conditions are not related to a service-connected disability and this matter does not involve the Philippines).

The Veterans Court affirmed the Board's decision. *Van Dermark*, 34 Vet. App. at 206. For purposes of its decision, the Veterans Court assumed arguendo that the treatment was "emergency treatment" under §§ 1728 and 1725. *Id.* at 209–10. And the Veterans Court concluded that, as Mr. Van Dermark did not dispute, the phrase "medical services" of § 1724(a) covers "emergency treatment" of §§ 1728 and 1725 and hence, by assumption for purposes of the

---

specified in 42 U.S.C. § 1395c (Medicare Part A) or § 1395j (Medicare Part B), a state plan under 42 U.S.C. § 1396 *et seq.* (Medicaid), or a specified "worker's compensation law or plan." 38 U.S.C. § 1725(f)(2).

appeal, the treatment Mr. Van Dermark received in 2016 and 2018. *Id.* at 210.

On the key point in dispute, the court ruled that "furnish[ing] . . . medical services" in § 1724 included VA's paying for treatment rendered by the direct hands-on providers independent of VA, including when the payment takes the form of "reimburse[ment]" paid directly to the veteran for the veteran's debt for the treatment. *Id.* at 210–15. The Veterans Court reasoned that "furnish" *can* be understood to include "provide for" something indirectly, *id.* at 210–11 (quoting *Webster's New International Dictionary* 1021 (2d ed. 1934)), and that § 1724 uses the broad sense, which includes paying for what others directly provide, as supported by the specific statutory context and its history and implementation: Notably, § 1724(b)'s specific authorization *to* "furnish hospital care and medical services" in certain circumstances has long been understood and applied to cover such payments, *id.* at 211–14. Having concluded that the prohibition of § 1724(a) applied to bar the requested payments for services abroad, the Veterans Court also concluded that §§ 1728 and 1725 did not override that prohibition because there was no basis for reading them to apply abroad. *Id.* at 214–15. Judge Greenberg dissented. *Id.* at 215–16.

Mr. Van Dermark timely appealed the Veterans Court's decision. Because Mr. Van Dermark raises an issue of law—statutory interpretation—we have jurisdiction under 38 U.S.C. § 7292. *Carter v. McDonough*, 46 F.4th 1356, 1359 (Fed. Cir. 2022). We review the Veterans Court's statutory interpretation de novo. *Gurley v. McDonough*, 23 F.4th 1353, 1356 (Fed. Cir. 2022).

## II

The question before us is the scope of the phrase "furnish hospital . . . care or medical services" in § 1724(a). Section 1724 is the 1991 recodification of what had been 38 U.S.C. § 624, Pub. L. No. 102-83, § 5(a), 105 Stat. 406 (1991), with the only change since 1991 being the 2000 addition of subsection (e), Pub. L. No. 106-377, § 1(a)(1) [title V, § 501(c)], 114 Stat. 1441, 1441A-58 (2000). Congress enacted § 624 in 1958 in a form containing the language and structure centrally at issue here, Pub. L. No. 85-857, 72 Stat. 1105, 1144 (1958), having adopted a similar version as part of a recodification the year before.[4]

Section 1724 reads in full:

---

[4]    The 1958 enactment, 38 U.S.C. § 624, read:

§ 624.  Hospital care and medical services abroad

(a) Except as provided in subsections (b) and (c), the Administrator shall not furnish hospital or domiciliary care or medical services outside the continental limits of the United States, or a Territory, Commonwealth, or possession of the United States.

(b) The Administrator may furnish necessary hospital care and medical services for any service-connected disability—

(1) if incurred during a period of war, to any veteran who is a citizen of the United States temporarily sojourning or residing abroad except in the Republic of the Philippines; or

(2) whenever incurred, to any otherwise eligible veteran in the Republic of the Philippines.

(c) Within the limits of those facilities of the Veterans Memorial Hospital at Manila, Republic of

(a) Except as provided in subsections (b) and (c), the Secretary shall not furnish hospital or domiciliary care or medical services outside any State.

(b)(1) The Secretary may furnish hospital care and medical services outside a State to a veteran who is otherwise eligible to receive hospital care and medical services if the Secretary determines that such care and services are needed for the treatment of a service-connected disability of the veteran or as part of a rehabilitation program under chapter 31 of this title.

(2) Care and services for a service-connected disability of a veteran who is not a citizen of the

---

the Philippines, for which the Administrator may contract, he may furnish necessary hospital care to a veteran of any war for any non-service-connected disability if such veteran is unable to defray the expenses of necessary hospital care. The Administrator may enter into contracts to carry out this section.

Pub. L No. 85-857, 72 Stat. 1144 (1958). This was part of a broad recodification of Title 38. *Id.* at 1105–1274.

A 1957 codification, Pub. L. No. 85-56, 71 Stat. 83–175 (1957), included 38 U.S.C. § 524, 71 Stat. 113, which read:

Sec. 524. The Administrator shall not furnish hospital or domiciliary care or medical services outside the continental limits of the United States, or a Territory, Commonwealth, or possession of the United States, except that he may furnish necessary hospital care and medical services for service-connected disabilities incurred during a period of war to veterans who are citizens of the United States temporarily sojourning or residing abroad.

United States may be furnished under this subsection only—

> (A) if the veteran is in the Republic of the Philippines or in Canada; or

> (B) if the Secretary determines, as a matter of discretion and pursuant to regulations which the Secretary shall prescribe, that it is appropriate and feasible to furnish such care and services.

(c) Within the limits of those facilities of the Veterans Memorial Medical Center at Manila, Republic of the Philippines, for which the Secretary may contract, the Secretary may furnish necessary hospital care to a veteran for any non-service-connected disability if such veteran is unable to defray the expenses of necessary hospital care.  The Secretary may enter into contracts to carry out this section.

(d) The Secretary may furnish nursing home care, on the same terms and conditions set forth in section 1720(a) of this title, to any veteran who has been furnished hospital care in the Philippines pursuant to this section, but who requires a protracted period of nursing home care.

(e) Within the limits of an outpatient clinic in the Republic of the Philippines that is under the direct jurisdiction of the Secretary, the Secretary may furnish a veteran who has a service-connected disability with such medical services as the Secretary determines to be needed.

38 U.S.C. § 1724.  "State" means "each of the several States, Territories, and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico."  *Id.* § 101.  We use "abroad" to mean "outside any State."

The two subsections of central significance here are (a) and (b). Subsection (a) prohibits VA from furnishing hospital care and medical services abroad, subject only to the "[e]xcept[ions]" stated in subsections (b) and (c). Subsection (b) then defines an exception that allows VA to furnish hospital care and medical services only for service-connected disabilities.[5] The other three subsections—inapplicable here, and on which Mr. Van Dermark has not relied for his argument—all concern the distinctive situation presented by the Republic of the Philippines, reflecting its unique relationship to the United States, especially during World War II. *See, e.g.*, S. Rep. No. 85-1469, at 1–12 (1958).[6]

We conclude that the "furnish" phrase at issue covers what Mr. Van Dermark claims here—VA payment for a veteran's treatment (*i.e.*, hospital care or medical services), whether payment is made to the treated veteran or to those to whom the veteran owes a debt for the treatment. It is undisputed that, if we so conclude, the § 1724(a) prohibition applies where, as in this case, the treatment was rendered abroad and is not for a service-connected disability. We also conclude that §§ 1728 and 1725 do not override the § 1724(a) prohibition.

---

[5]    The subsection refers also to "a rehabilitation program under chapter 31," 38 U.S.C. §§ 3100–3122, which applies to "veterans with service-connected disabilities," 38 U.S.C. § 3100; *see* 38 U.S.C. ch. 31 heading.

[6]    VA has explained that it "has had a presence in the Philippines since 1922" and its "Manila Regional Office and Outpatient Clinic is the only VA office located outside [the] United States or its territories," with the Clinic offering various medical services. *Fact Sheet*, Department of Veterans Affairs (Sept. 2020), https://www.benefits.va.gov/ROMANILA/docs/VAManilaFactSheet.pdf.

A

Our analysis of the phrase at issue from § 1724(a) ("furnish hospital . . . care or medical services") reflects the fact that what is substantively the same phrase appears in § 1724(b) ("furnish hospital care and medical services"). The phrase in subsection (a) is a prohibitory, "shall not" phrase, and so uses "or," whereas the phrase in subsection (b) is an authorizing, "may" phrase, and so uses "and." But Mr. Van Dermark agrees that the two phrases have the same meaning with respect to the disputed issue of coverage of VA's payment for treatment provided by others, Oral Arg. at 1:43–50, and we see no basis for a contrary conclusion. *See also* Oral Arg. at 19:45–20:20 (Secretary urging same meaning).

This premise is important for at least two reasons. First, the phrase appears in the 1940 predecessor to current § 1724(b) (and in the 1958- and 1957-enacted statutes quoted above)—that is, in the phrase authorizing VA to furnish treatment abroad for service-connected conditions.[7]

---

[7]    In 1933, Congress granted VA authority to "furnish . . . medical and hospital treatment" in existing VA facilities to certain veterans.  Title I § 6, Pub. L. No. 73-2, 48 Stat. 8 (1933).  That authority was implemented in two 1933 executive orders (available at 38 U.S.C. Ch. 12A (1934)) that by regulation authorized VA to "furnish . . . hospital care, including medical treatment" in VA facilities to certain veterans, but declared that "[n]o person shall be entitled to receive domiciliary, medical, or hospital care, including treatment, who resides outside of the continental limits of the United States or its territories or possessions," Exec. Order No. 6094 §§ I, IV; *see* Exec. Order No. 6232 §§ I, IV (same).  In 1940, Congress "amended" § IV of the regulation "to read as follows," authorizing care abroad:

Accordingly, we look to 1940 (or to 1933–1940) as the pertinent time of initial congressional adoption, a fact of significance in statutory interpretation, and we focus on the scope of Congress's authorization of treatment abroad.

Second, a narrowing of the "furnish" phrase would simultaneously narrow the § 1724(a) prohibition and the § 1724(b) authorization. With respect to what benefits veterans, the two effects are opposites—the first would relax a limit on possible benefits to veterans, and the second would constrain the provision of benefits to veterans. In fact, VA has long been paying for veteran-obtained care abroad under § 1724(b), and Mr. Van Dermark agrees that his interpretation would require curtailment of VA's practice, Oral Arg. at 1:00–2:10. In the circumstances before us, where each of the argued-for interpretations would benefit some veterans at the expense of others, and we lack information to compare magnitudes, we see no role for the pro-veteran interpretive canon. *See Burden v. Shinseki*, 727 F.3d 1161, 1169 (Fed. Cir. 2013).

1

We start with consideration of the statutory provision's "ordinary meaning at the time Congress enacted the

---

No person shall be entitled to receive domiciliary, medical, or hospital care, including treatment, who resides outside of the continental limits of the United States or its Territories or possessions: *Provided*, That in the discretion of the Administrator of Veterans' Affairs necessary hospital care, including medical treatment, may be furnished to veterans who are citizens of the United States and who are temporarily sojourning or residing abroad, for disabilities due to war service in the armed forces of the United States.

Pub. L. No. 76-866, § 4, 54 Stat. 1195 (1940).

statute." *New Prime Inc. v. Oliveira,* 139 S. Ct. 532, 539 (2019) (cleaned up). The language permits a meaning that includes the meaning adopted by the Veterans Court. The prominent comprehensive contemporaneous dictionary, *Webster's Second,* released in 1934, gives definitions of "furnish" that include "to provide" and (listed first among the non-obsolete meanings) "to provide for." *Webster's New International Dictionary of the English Language* 1021 (2d ed. 1937). Each definition on its face—as well as "provide what is necessary for," listed next to "provide for" in the same definition, *id.*—is sufficiently broad to include, where context makes it appropriate, both directly delivering treatment and more indirectly enabling receipt of treatment by paying (in advance or after the fact) for the treatment, whether payment is made to the treater or to the recipient. And nothing on the face of § 1724 precludes the broader meaning, under which Congress barred VA from both the delivery and payment roles for treatment abroad, subject to specific exceptions for service-connected problems and the special situation presented by the Philippines.

Thus, the expression at issue here is one that can be used differently in different settings—for example, to refer just to the actions of the direct treaters (or their principals) or, more broadly, to various forms of indirect provision, including by funding. Context always matters, *Artis v. District of Columbia,* 138 S. Ct. 594, 603–04 (2018); *Johnson v. United States,* 559 U.S. 133, 139 (2010), and "the specific context in which that language is used" is especially important, *Merit Management Group, LP v. FTI Consulting, Inc.,* 138 S. Ct. 883, 892–93 (2018). Still more specifically, courts give effect to clear differences in context to identify which of the available meanings is the right one for a particular setting, even if the differences are among parts of a single overall statute. *See Return Mail, Inc. v. U.S. Postal Service,* 139 S. Ct. 1853, 1863 (2019) (requiring different meanings "when a statutory term is used throughout a

statute and takes on 'distinct characters' in distinct statutory provisions" (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 320 (2014))); *Cherokee Nation v. State of Georgia*, 30 U.S. (5 Pet.) 1, 19 (1831). That approach applies *a fortiori* within a chapter of a title of the U.S. Code when the differences are among provisions enacted at different times.

Here, for the reasons now set forth, we conclude that the "specific" context supports the broader meaning within § 1724.

2

Mr. Van Dermark effectively agrees that the narrow direct-provision meaning is not appropriate for § 1724. In particular, he accepts that § 1724(b)'s use of "furnish . . . medical services"—and hence, too, § 1724(a)'s use of the same phrase—reaches beyond VA's own delivery of care, through its own facilities, employees, or agents making VA the principal responsible for the treatment (the "provider" in modern parlance). *E.g.*, Reply Br. at 8–9; *Van Dermark*, 34 Vet. App. at 211. And he does not dispute the Veterans Court's explanation of the evident reason: Congress was seeking to enable veterans abroad to get treatment for service-connected disabilities, and VA had virtually no presence abroad. *Van Dermark*, 34 Vet. App. at 212–13 (discussing both 1940 legislative history and VA non-presence abroad); *see* U.S. Br. at 23–24; Annual Report of the Administrator of Veterans' Affairs for the Fiscal Year Ended June 30, 1941, at 11, 52–53 (1942). Mr. Van Dermark adds, moreover, that there are "good reasons" for a congressional policy against a VA expansion of its presence abroad that would put it "in the business of providing care abroad through its own facilities or through other advance arrangements with private providers" abroad, *e.g.*, that "giving the Secretary's medical infrastructure a global reach might entail unwanted complexities, including the

need to reconcile such infrastructure with the healthcare laws of other nations." Opening Br. at 29–30.

These acknowledgements confirm the inappropriateness of the narrow reading of the phrase at issue in § 1724. They also indicate why the broader reading allows § 1724(b) to be more effective in furthering the evident congressional purpose of enabling veterans to receive care abroad for service-connected conditions. "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored," and "evident purpose always includes effectiveness." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 4, at 63 (2012); *see also Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1323 (Fed. Cir. 2021). Congress allowed the Secretary to make judgments about how to implement the authorization, considering all relevant factors, including benefits to veterans, administrative costs, and others. The broad reading of the scope of authorization thus permits the grant of authority to be more effective in achieving the plain congressional purposes.

Later expressions of congressional understanding lend further support to the broader reading of the "furnish" phrase in § 1724, which encompasses paying for treatment delivered by others for whom VA was not the principal. When Congress enacted 38 U.S.C. § 624 in 1958, it considered the proper scope of the special provisions for the Philippines. In that context, the Senate Committee recognized, based on the submissions of VA and the Bureau of the Budget, that "American veterans residing in other countries, such as France, England, or Germany, are not given medical care *at VA expense* for non-service-connected disabilities." S. Rep. No. 85-1469, at 5 (1958) (emphasis added). The phrase suggests coverage, by the statutory phrase at issue, of the payment function here in dispute.

Congressional action in 1987 is even more supportive of the broader reading of the phrase in dispute. Before

1988, subsection (b)—of what was then 38 U.S.C. § 624—permitted VA to furnish care abroad only if the veteran receiving care was "a citizen of the United States" or "in the Republic of the Philippines." 38 U.S.C. § 624(b) (1982). In 1988, Congress amended the subsection to cover U.S. veterans who were Canadian citizens living in Canada. *See* Title I § 105, Pub. L. No. 100-322, 102 Stat. 487 (1988) (providing that VA may furnish care to non-citizens "only . . . if the veteran is in the Republic of the Philippines or Canada" or otherwise "as a matter of discretion"). The pertinent House Committee described the effect of the House bill, which included language substantially similar to that of the final enactment. *Compare* H.R. Res. 2616, 100th Cong. (1987), *and* H.R. Rep. No. 100-191, at 54, *with* Title I § 105, Pub. L. No. 100-322, 102 Stat. 487 (1988). It explained that such Canadian citizens would be able to receive medical care "for their service-connected conditions *on a reimbursable basis* by the VA," H.R. Rep. No. 100-191, at 11 (emphasis added), demonstrating that Congress understood § 1724(b)'s grant of authority to furnish care abroad to permit reimbursement. That language is used in § 1728 (already enacted by 1987), and in § 1725 (yet to be enacted), to refer to payment to the veteran, not to payments to the direct provider "in lieu of reimbursing [the] veteran." 38 U.S.C. § 1728(b); *see* 38 U.S.C. § 1725(a)(2).

Mr. Van Dermark advances a kind of middle position. He contends that VA must have some kind of contract with the treating persons or entities in order for its role in enabling veterans to receive services to constitute "furnishing" the services. Opening Br. at 28, 31–34; Reply Br. at 5, 9. This contention, even aside from some uncertainty about what Mr. Van Dermark suggests must be in the contract, is unpersuasive.

The suggestion runs counter to the indications of congressional contemplation, quoted above, that the furnishing phrase covers VA bearing the "expense" and covers "reimbursement"—the latter term focusing on the VA-

veteran relationship, not a VA-treater relationship. More fundamentally, Mr. Van Dermark has supplied no persuasive reason that a contractual obligation, on VA's part or on direct service deliverers' part, is a necessary aspect of "furnishing" (*e.g.*, "providing for") in its available, broad sense, which encompasses indirect provision through paying to help enable receipt of the service. That sense might even encompass such paying without any obligation preexisting the service, but it readily encompasses what is invoked here—an alleged obligation to pay that preexisted the service—and that meaning is independent of the particular legal basis for the obligation, whether the obligation is contractual or, instead, as Mr. Van Dermark asserts here, statutory or regulatory.

When Congress wished to focus on contracts as one means of implementing the "furnishing" phrase, it did so by including *additional* language, over and above the "furnishing" phrase itself. In § 1724, for example, subsection (c) ends with a sentence saying: "The Secretary may enter into contracts to carry out this section." 38 U.S.C. § 1724(c). The separate mention of contracts confirms that the "furnishing" phrase itself does not require contracts. And the "may" language makes clear that all it does is declare that contracts are one way to implement the section, not that they are the only way.

Sections 1703 and 1703A provide an instance in which Congress used additional language to refer to contracts when VA is furnishing care by paying for care directly delivered by others. Section 1703, in its current form, states that the Secretary "shall, subject to the availability of appropriations, furnish hospital care, medical services, and extended care services to a covered veteran through [specified] health care providers," 38 U.S.C. § 1703(d)(1), which include "[a]ny health care provider that is participating in the Medicare program," *id.* § 1703(c)(1), in certain enumerated circumstances, including where "the covered veteran and the covered veteran's referring clinician agree that

furnishing care and services through a non-Department entity or provider would be in the best medical interest of the covered veteran based upon criteria developed by the Secretary," *id.* § 1703(d)(1)(E); *see also id.* § 1703(a), (e). This language clearly uses the "furnishing" phrase in the broad sense now at issue. *See id.* § 1703(i) (addressing "payment rates for care and services," referring to Medicare rates (capitalization removed)).

The provision then uses additional language to address the matter of VA-treater contracts for this indirect provision of care, seemingly (we need not here say definitively) to require such contracts. *See id.* § 1703(h) (requiring the Secretary to "enter into consolidated, competitively bid contracts to establish networks of health care providers specified in . . . subsection (c) for purposes of providing sufficient access to hospital care, medical services, or extended care services"); *id.* § 1703A(a)(1)(A), (B) (stating that, in specified circumstances, the Secretary "may furnish such care or service . . . through an agreement under this section," giving the agreement the name, "Veterans Care Agreement"). If there is such a requirement, it is established by language over and above the "furnishing" phrase. Such provisions confirm that Mr. Van Dermark's contract view is not to be read into the phrase itself.

3

VA's actions over time reflect the broad reading of the "furnish" phrase at issue. In 1968, VA promulgated a regulation, under the heading "Payment or reimbursement of the expenses of unauthorized hospital care and other medical expenses," approving VA reimbursement to certain veterans for certain emergency medical treatment, related to service-connected disabilities, received from non-VA facilities for which those veterans did not get authorization from VA in advance of treatment. 33 Fed. Reg. 19,011 (Dec. 20, 1968) (38 C.F.R. § 17.80 (1968)). At the time, VA's only statutory authority for the regulation was its authority to

"furnish" care.  38 U.S.C §§ 610–612, 624 (1958).  The re-imbursement regulation rests on an understanding that furnishing care includes paying for emergency care received from non-VA facilities without prior VA involvement.  That action preceded Congress's enactment of 38 U.S.C. § 1728 (then 38 U.S.C. § 628) in 1973, which expanded VA's approach and created a clearer statutory foundation.  *Compare* Pub. L. No. 93-82, § 106, 87 Stat. 179 (1973), *with* 33 Fed. Reg. 19,011.  *See also* S. Rep. No. 92-776, at 29 (1972); S. Rep. No. 93-54, at 25 (1973) (similar).

In fact, the parties do not dispute two key facts about VA's longstanding practice relevant here.  First, aside from the treatment for service-connected disabilities where subsection (b) applies, and the situations covered by the Philippines-specific subsections, VA has not paid for treatment abroad, even in the five decades or so after enactment of § 1728 (then 38 U.S.C. § 628) in 1973.  *See, e.g.*, S. Rep. No. 85-1469, at 5 (quoted above: "American veterans residing in other countries, such as France, England, or Germany, are not given medical care at VA expense for non-service-connected disabilities.").  Second, VA *has* long paid for treatment abroad where subsection (b) applies (or where the Philippines subsections apply).  Current 38 C.F.R. § 17.35(a) and (c)—with predecessors dating back as far as 1959, *see* 24 Fed. Reg. 8,327 (Oct. 14, 1959) (38 C.F.R. § 17.36); *see also* 33 Fed. Reg. 19,011 (1968 regulations 38 C.F.R. §§ 17.80, 17.84)—make clear that, under the Foreign Medical Program, eligible veterans can submit claims for payment for reimbursement for treatment received abroad, if properly tied to a service-connected disability, even if not authorized by VA in advance. When VA adopted the current provision in 2018, it said that it was doing so to "clarify" and "reflect current VA practice and statutory

authority." 83 Fed. Reg. 29,447 (June 25, 2018); *see* 83 Fed. Reg. 4,452 (Jan. 31, 2018) (proposed rule).[8]

Mr. Van Dermark's position, which he acknowledges would require alteration of VA practice, Oral Arg. at 1:00–2:10, would represent a break with VA's long practice both

---

[8]    *See Van Dermark*, 34 Vet. App. at 213–14; VA Health Administration Center, *Foreign Medical Program Fact Sheet 01-17* (Nov. 2001), https://web.archive.org/web/20020922203959/http://www.va.gov/hac/fact sheet/fspages/01-17fmpprovidersheet.pdf ("The Foreign Medical Program (FMP) . . . provides reimbursement for VA adjudicated service-connected conditions. . . . Claims are reviewed to determine whether the medical care provided is related to the service-connected condition."); VA Health Administration Center, *Foreign Medical Program Fact Sheet 01-5* (Nov. 2001), https://web.archive.org/web/20020922204000/http://www.va.gov/hac/fact sheet/fspages/01-05fmp.pdf ("The FMP is a program for veterans who live or travel overseas. Under the FMP, Veterans Affairs will pay 100% of the charges for any health care the veteran needs that is associated with a service connected disability."); VA Health Administration Center, *Foreign Medical Program* (Aug. 2001) (explaining that FMP is for "US veterans with VA-rated service-connection conditions who are residing or traveling abroad (Canada and Philippines excluded)," under which "VA assumes payment responsibility for certain necessary medical services associated with the treatment of those service-connected conditions"); VA, *Federal Benefits for Veterans and Dependents* (Jan. 1981) ("The Veterans Memorial Hospital in Manila is the only overseas hospital where VA-paid care is available to veterans with nonservice-connected disabilities.").

of *not* paying for non-service-connected-disability emergency treatment abroad and of *paying* (without contracts) for service-connected-disability treatment abroad. That consequence provides additional reason to reject Mr. Van Dermark's interpretation. *See National Labor Relations Board v. Noel Canning*, 573 U.S. 513, 525 (2014) ("The longstanding practice of the government can inform our determination of what the law is." (cleaned up)).

4

Mr. Van Dermark points to other provisions within chapter 17 of Title 38 of the U.S. Code for support for his view, either because they use "furnish medical services" or a similar phrase to refer only to the direct treatment providers to whom a patient owes payment for the treatment or because they refer to VA contracts with the treaters (or their principals). Such provisions do not alter the conclusion about the meaning in § 1724. The essence of the context-dependency principle most recently stated in *Return Mail*, as quoted above, is that a term with one meaning in one provision can take on a different meaning in a different provision that contains surrounding words that require the different meaning. That principle differentiates the "furnish" provisions on which Mr. Van Dermark relies from § 1724. And the "contract" provisions to which he points depend not on a narrow meaning of the "furnish" phrase but on additional language for their contract prescriptions.

Sections 1725 and 1728 contain surrounding words that establish they use "furnish," with "treatment" as the object, to refer to the direct provision (and only the direct provision) of emergency treatment. Section 1728 permits VA to, "in lieu of reimbursing [an eligible] veteran," directly pay "the hospital or other health facility furnishing the emergency treatment." 38 U.S.C. § 1725(b)(1). And § 1725 speaks expressly of "reimburse[ment]" for the reasonable value of the emergency "treatment furnished," *id* § 1725(a)(1); *see id.* § 1725(b). The same is true of 38 U.S.C.

§ 1720J(a), which directs the Secretary, in a three-item list, to "furnish emergent suicide care to an eligible individual at a medical facility of the Department," to "pay for emergent suicide care provided to an eligible individual at a non-Department facility," and to "reimburse an eligible individual" for such non-VA-facility care. The "furnish" phrase there, because of the surrounding words, refers to direct provision.

Other provisions cited by Mr. Van Dermark are akin to §§ 1703 and 1703A, discussed above, which authorize the Secretary to furnish services through third-party providers and which use *additional* language to authorize or perhaps require contracts to do so. *See* 38 U.S.C. § 1712A(e)(1) (granting the Secretary "the same authority to enter into contracts or agreements with private facilities" when "furnishing counseling and related mental health services under subsections (a) and (b)"); *id.* at § 1720I(c)(1)–(2) (granting the Secretary the authority "to enter into contracts or agreements" pursuant to § 1703 "or any other provision of law" when "furnishing mental or behavioral health care services" to certain individuals); *id.* at § 1720C(a), (b)(1) (granting the Secretary authority to "furnish medical, rehabilitative, and health-related services in noninstitutional settings" or eligible veterans "in need of[] nursing home care" "solely through contracts with appropriate public and private agencies"); *id.* at § 1788(c) (granting the Secretary authority to "furnish to [a] live donor" certain "care and services . . . at a non-Department facility pursuant to an agreement entered into by the Secretary under [Title 38]"). None of the provisions cited by Mr. Van Dermark imply that, in § 1724, the "furnish" phrase is less broad than we have concluded.

## B

Having concluded that § 1724(a) prohibits the requested VA payment for treatment abroad, we also conclude that the prohibition is not overridden by the later-

enacted §§ 1728 or 1725.  Mr. Van Dermark contends that, even if the "furnish" phrase in § 1724(a)'s prohibition includes "reimbursement," §§ 1725 and 1728 conflict with the prohibition and that the proper resolution of the conflict is that §§ 1725 and 1728 govern.  We reject that contention at the threshold, finding no conflict needing to be resolved.

The threshold task is to determine if the provisions can be harmonized.

> When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at "liberty to pick and choose among congressional enactments" and must instead strive "'to give effect to both.'"  *Morton v. Mancari,* 417 U.S. 535, 551 (1974).  A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing "'a clearly expressed congressional intention'" that such a result should follow.  *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533 (1995).  The intention must be "'clear and manifest.'" *Morton, supra,* at 551.  And in approaching a claimed conflict, we come armed with the "stron[g] presum[ption]" that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute. *United States v. Fausto,* 484 U.S. 439, 452, 453 (1988).

*Epic Systems v. Lewis,* 138 S. Ct. 1612, 1624 (2018) (alterations in original) (citations in original, but parallel citations omitted); *see* Scalia & Garner, *Reading Law* § 27, at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

Here, harmonization is straightforward.  Section 1724 requires VA to furnish care abroad in limited circumstances and bars VA from furnishing care abroad in all

other circumstances. Section 1728 requires that VA reimburse certain veterans for emergency treatment they receive at non-VA facilities, under VA's power to furnish care, but there is no mention of treatment abroad. The same is true of section 1725. The simple textual harmonization of the three provisions is that §§ 1728 and 1725 do not apply to treatment abroad when such treatment is outside the limited authorization of § 1724(b) to furnish such treatment.

There is, accordingly, no conflict of provisions that must be resolved by reference to an identification of greater specificity or on any other basis. And there is no occasion to test §§ 1728 and 1725 against the presumption against extraterritoriality.

## III

For the foregoing reasons, we affirm the Veterans Court's decision, concluding that 38 U.S.C. § 1724(a) bars VA from reimbursing Mr. Van Dermark for the treatment he received abroad.

The parties shall bear their own costs.

**AFFIRMED**