(Slip Opinion)

# Applicability of the Federal Credit Reform Act to Political Risk Insurance of Debt Issued by the United States International Development Finance Corporation

The organic statute of the United States International Development Finance Corporation does not impliedly exempt DFC's political risk insurance of debt from the budgeting and accounting rules imposed by the Federal Credit Reform Act of 1990.

May 29, 2024

MEMORANDUM OPINION FOR THE
VICE PRESIDENT AND GENERAL COUNSEL
UNITED STATES INTERNATIONAL DEVELOPMENT
FINANCE CORPORATION

The Federal Credit Reform Act of 1990 ("FCRA") protects the public fisc by imposing budgeting and accounting rules on federal agencies' credit offerings. This dispute concerns whether FCRA applies when the United States International Development Finance Corporation ("DFC") insures debt against political risks under its organic statute, the Better Utilization of Investments Leading to Development Act of 2018 ("BUILD Act"), 22 U.S.C. §§ 9601–9689. DFC argues that FCRA does not apply, but the Office of Management and Budget ("OMB") disagrees, and you have asked us to resolve the dispute.

For the reasons that follow, we agree with OMB. FCRA expressly covers "insurance" of debt, 2 U.S.C. § 661a(3), and Congress did not expressly exempt DFC's political risk insurance of debt from FCRA. DFC thus bears a substantial burden to show that Congress created an implied exception to FCRA's government-wide framework for budgeting for credit activities. But the features of the BUILD Act and historical practice that DFC invokes speak less clearly than DFC suggests, and DFC thus fails to satisfy its burden.[1]

---

[1] To support our consideration of this question, we received views from DFC and OMB. *See* Letter for Gillian Metzger, Acting Assistant Attorney General, Office of Legal Counsel, from Sarah E. Fandell, Vice President & General Counsel, DFC, *Re: Request for the Opinion of the Office of Legal Counsel* (Dec. 15, 2023) (attaching Memorandum *Re: The Federal Credit Reform Act of 1990 and Political Risk Insurance Under the "BUILD" Act*) ("DFC Submission"); Letter for Gillian Metzger, Deputy Assistant Attorney General, Office of Legal Counsel, from Daniel Jacobson, General Counsel, OMB (Jan. 2, 2024)

## I.

## A.

Congress enacted FCRA in 1990 as the "culmination of . . . reform efforts" aimed at strengthening Congress's control over the federal government's credit programs. 2 Government Accountability Office, *Principles of Federal Appropriations Law* 11-15 (3d ed. 2006) ("*Federal Appropriations Law*"). Before 1990, the federal government budgeted for credit programs on a cash basis. 2 *Federal Appropriations Law* at 11-12. Under this approach, an agency recorded an obligation, and paid that obligation from an appropriation, only when a concrete obligation to pay materialized. *Id.* at 11-12 to -13. This distorted budgeting for federal credit activities in two directions. First, cash budgeting made loans appear artificially costly at the time of issuance because agencies had to obligate the full loan amount up front, even when most loans would likely be repaid. Barry B. Anderson & Kim H. Burke, *Budgeting for Loans and Guarantees: The United States Federal Credit Reform Act*, OECD J. on Budgeting, 2021, at 1, 6. Second, cash budgeting made loan guarantees appear artificially costless at the time of issuance because any obligation to pay would only materialize in the future if the underlying loan defaulted. 2 *Federal Appropriations Law* at 11-12.

This latter distortion allowed agencies to impose costs on the public fisc outside congressional control, as it meant that agencies employing cash budgeting could agree to guarantee loans before receiving appropriations from Congress, with appropriations required only if and when a default occurred. *Id.* At that point, Congress had no real choice but to step in and ensure the guarantee would be paid. *Id.*; *see also, e.g., Federal Credit Reform: Hearing Before the Task Force on Urgent Fiscal Issues of the H. Comm. on the Budget*, 101st Cong. 2 (1990) (statement of Rep. Schumer, Chairman, Task Force on Urgent Fiscal Issues of the H. Comm.

---

("OMB Submission"); Letter for Christopher Fonzone, Assistant Attorney General, Office of Legal Counsel, from Sarah E. Fandell, Vice President & General Counsel, DFC, *Re: Reply in Support of a Request for an Opinion from the Office of Legal Counsel* (Jan. 30, 2024). We also directed questions at each agency and received responses. *See* OMB Responses to Office of Legal Counsel Questions (Feb. 8, 2024) ("OMB Responses"); DFC Responses to Office of Legal Counsel Questions (Feb. 13, 2024) ("DFC Responses").

on the Budget) (noting that, although "a loan guarantee . . . costs nothing in the [pre-FCRA] budget process," "[t]he problem . . . is that the chickens come home to roost" and that, "[i]f there was a budget hit" "every time [a] guarantee[] was extended, . . . the Administration, Congress, all of Washington might have been more careful").

Given these distortions, "[n]o one involved in the budget process—Congress, the Office of Management and Budget, [the General Accounting Office ("GAO")[2]]—particularly liked [the existing cash basis] system." 2 *Federal Appropriations Law* at 11-13. Congress, in particular, was concerned that the system deprived it of its control, under the Appropriations Clause, of "how and when . . . money should be applied" to the federal government's credit programs. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990) (quoting Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)); *see* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"); *see also* H.R. Rep. No. 101-455, at 202 (1990) (statement of 14 members of Congress noting that cash budgeting deprived policymakers of the ability to "control" the "cost of credit activities"). Congress thus enacted FCRA to "measure more accurately the costs of [such] programs" and "place the cost of credit programs on a budgetary basis equivalent to other Federal spending"—changes that it believed would ultimately "improve the allocation of resources among credit programs and between credit and other spending programs." 2 U.S.C. § 661(1), (2), (4).

FCRA accomplishes these goals by defining the "cost" of federal credit programs to better track economic realities and then requiring agencies to operate based on those costs. Specifically, FCRA states that agencies may enter into a credit agreement only if Congress has provided appropriations for the subsidy "cost" of such an agreement in an "appropriations Act." *Id.* § 661c(b). FCRA defines this subsidy cost as an "estimate[]" of the "long-term cost to the Government" of all cash inflows and outflows resulting from the agreement, "calculated on a net present value basis." *Id.* § 661a(5)(A); *see id.* § 661a(5)(B), (C). Hence, under FCRA, before

---

[2] In 2004, Congress changed GAO's name from the General Accounting Office to the Government Accountability Office. *See* GAO Human Capital Reform Act of 2004, Pub. L. No. 108-271, § 8, 118 Stat. 811, 814. We use the abbreviation "GAO" to refer to both entities.

an agency enters into credit agreements, it must ensure that it has sufficient appropriations to cover the estimated present value of those agreements. *Id.* § 661c(b).

Consistent with its goal of establishing a government-wide framework for budgeting for credit programs, Congress gave FCRA a broad ambit. Congress applied FCRA's requirements to both "direct loans" and "loan guarantees," the latter of which FCRA defines capaciously as "any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender," excluding "the insurance of deposits, shares, or other withdrawable accounts in financial institutions." *Id.* § 661a(1), (3). FCRA also expressly "supersede[s], modif[ies], or repeal[s]" any preexisting laws to the extent those laws are "inconsistent" with FCRA. *Id.* § 661f(a).

As a result of the broad background rule that FCRA establishes, OMB—which Congress by statute charged with implementing FCRA, *id.* § 661b(a)—observes that many credit programs across the federal government are unquestionably subject to FCRA even though their statutory authorizations do not mention it. OMB Submission at 6 & n.28 (providing the Community Disaster Loan Program, 42 U.S.C. § 5184, as an example). And although Congress has made a handful of express exceptions to FCRA, *e.g.*, 2 U.S.C. § 661e(a); 12 U.S.C. § 1715z–23(w)(1), OMB is not aware of any laws that it or GAO has found to impliedly carve out a program from all of FCRA's requirements, *see* OMB Responses at 4–5.

## B.

This dispute arose because DFC argues that Congress created a categorical exemption from FCRA for DFC's political risk insurance of debt. To make this argument, DFC relies on the history of its predecessor agency—the Overseas Private Investment Corporation ("OPIC")—and the text of DFC's organic statute, the 2018 BUILD Act.

## 1.

Congress established OPIC in 1969. Foreign Assistance Act of 1969, Pub. L. No. 91-175, sec. 105, § 231, 83 Stat. 805, 809 (codified as amended at 22 U.S.C. § 2191 (2018)). Before its replacement by DFC, OPIC

operated loan, loan guarantee, and political risk insurance programs for the purpose of encouraging investment in less-developed countries. 22 U.S.C. §§ 2191, 2194(a), (b), (c) (2018). OPIC's political risk insurance covered both non-debt and debt transactions, although its statutory authorities did not distinguish between these two types of insurance. *See id.* § 2194(a). But OPIC could provide political risk insurance for only a discrete list of risks: currency inconvertibility; "expropriation or confiscation by action of a foreign government or any political subdivision thereof"; "loss due to war, revolution, insurrection, or civil strife"; and "business interruption[s]" caused by the other insurable risks. *Id.*

Because OPIC operated credit programs, FCRA changed the budgetary rules that governed OPIC. Congress thus took steps after enacting FCRA to conform OPIC's programs to the new law. *See, e.g.*, H.R. Rep. No. 102-1026, at 25-26 (1992) (Conf. Rep.); H.R. Rep. No. 102-551, at 22 (1992). In particular, Congress began funding OPIC's loans and loan guarantees through annual appropriations, even as it funded all other OPIC programs, including political risk insurance, through a mandatory appropriation via a "noncredit account revolving fund." Jobs Through Exports Act of 1992, Pub. L. No. 102-549, §§ 104(a)(2), 106, 106 Stat. 3651, 3652–54 (codified as amended at 22 U.S.C. §§ 2195(a)(2), 2198(d), (e) (1994)) ("Jobs Through Exports Act"). In 2003, Congress reinforced that split treatment by providing that "[a]ny payments made to discharge liabilities under investment insurance or reinsurance . . . shall be paid first out of the noncredit account revolving fund," but that "[a]ny payments made to discharge liabilities under [loan guarantees] or [loans] shall be paid in accordance with [FCRA]." 22 U.S.C. § 2195(d) (2018).

These amendments made clear that OPIC had to budget for its loans and loan guarantees in a manner consistent with FCRA but raised the question of how OPIC should budget for its political risk insurance of debt. We have little evidence of how OPIC did so from FCRA's 1990 enactment until the early 2000s. In 2002, however, OMB rejected OPIC's argument that it could invoke its political risk insurance authority to guarantee the Philippines' obligations concerning $200 million in bonds without complying with FCRA. Letter for Mark Garfinkle, Vice President & General Counsel, OPIC, from Philip J. Perry, General Counsel, OMB at 1 (Oct. 11, 2002). Specifically, OMB found that the Philippines product was an investment guarantee and informed OPIC that the "Office of Legal

Counsel . . . agree[d]" that the product "must be treated as loan guarantees under the FCRA." *Id.* at 2.

In 2004, OMB and OPIC entered into an agreement governing the treatment of OPIC's insurance against political risk. Letter for Dr. Peter S. Watson, President & CEO, OPIC, from Joel D. Kaplan, Deputy Director, OMB at 1–2 (Jan. 5, 2004) ("Kaplan Letter"). OMB and OPIC agreed that OPIC, prior to "assuming any contractual obligations," would "notify" OMB "of the proposed terms of any product involving the insurance of debt which OPIC plans to issue under its expropriation insurance authority." *Id.* at 1. In turn, OMB would "expeditiously conduct a case-by-case analysis of whether the proposed product should be subject to FCRA," guided by the principles that "products that insure repayment of debt only against inconvertibility of funds or political violence are not subject to FCRA" and that "other products that insure repayment of debt must be carefully considered on a case-by-case basis." *Id.* In performing this analysis, OMB would focus on "whether a proposed product is in substance" more like a "commercial loan guarantee, in that it guarantees against conventional risks of default on debt," or "is instead a more limited insurance policy against particular acts that fall within the international law definition of 'expropriation.'" *Id.* at 2.

Under that agreement, the agencies often—but not invariably—applied FCRA even to debt-related products that OPIC believed constituted political risk insurance. Between 2004 and the 2018 passage of the BUILD Act, OPIC entered into 12 such transactions. DFC Responses at 2. But OMB treated only four of those transactions as exempt from FCRA. *Id.* And in any event, OPIC's political risk insurance of debt remained a relatively small part of its insurance portfolio around the time of the BUILD Act's enactment, accounting for only 20% of the total. DFC Responses at 4.

## 2.

Against this backdrop, Congress enacted the BUILD Act and created DFC. The BUILD Act consolidated all of OPIC with portions of the U.S. Agency for International Development, 22 U.S.C. § 9683, and gave DFC expanded authority to make investments in developing economies. As relevant here, DFC can, like its predecessor OPIC, make loans and loan guarantees. *Id.* § 9621(b)(1). Like OPIC, DFC can also issue political risk

insurance of both debt and non-debt investments pursuant to a statutory authority that does not explicitly differentiate between the two. *Id.* § 9621(d). Unlike OPIC, however, DFC has authority to "issue insurance or reinsurance . . . against any or all political risks," *id.*, not simply the discrete political risks that limited OPIC (currency inconvertibility, expropriation, loss due to war or civil strife, and certain business interruptions).

The BUILD Act expressly states that DFC's loan and loan guarantee programs are "subject to the requirements" of FCRA. *Id.* § 9621(b)(3); *see also id.* § 9622(b)(10) (stating that DFC "may not make loans or loan guaranties except to the extent that budget authority to cover the costs of the loans or guaranties is provided in advance in an appropriations Act, as required by [FCRA]"). And when the BUILD Act establishes DFC's "Corporate Capital Account," it refers in three places to the "cost" under FCRA "of loans and loan guaranties." *Id.* § 9634(b)(6), (d)(1)(A), (d)(2). By contrast, when the BUILD Act authorizes DFC to provide political risk insurance—of both debt and equity—it is silent on the application of FCRA to such insurance. *Id.* § 9621(d). So is the rest of the BUILD Act.

## II.

As noted above, FCRA expressly covers "loan guarantees," which it defines as "any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender," with certain exceptions not applicable here. 2 U.S.C. § 661a(3). That definition unambiguously sweeps in DFC's political risk insurance of debt: Such insurance is "insurance . . . with respect to the payment of . . . principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender." *Id.* By its terms, therefore, FCRA applies to DFC's political risk insurance of debt.

The question we face is thus whether Congress removed this form of debt insurance from FCRA's reach. Nothing in the BUILD Act expressly exempts political risk insurance of debt from FCRA. As a result, to agree with DFC, we would need to conclude that the BUILD Act impliedly does so. This is a high bar for DFC to surmount, particularly when it is seeking an exception to a government-wide framework statute that Congress put in place to protect one of its core constitutional prerogatives. Although it

is a close question, for the reasons provided below, DFC ultimately fails to satisfy this heavy burden.

**A.**

"[R]epeals by implication are not favored" and require a "clear and manifest" intention to repeal or an "irreconcilable" conflict between two statutes. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 549–51 (1974)). "When confronted with two Acts of Congress allegedly touching on the same topic," we must "strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *Morton*, 417 U.S. at 551). A party claiming that "two statutes cannot be harmonized, and that one displaces the other," thus "bears [a] heavy burden." *Id.* Moreover, the presumption against implied repeals applies with no less force to "implied amendments" or "partial repeal[s]," such as DFC's claim for an implied carveout from FCRA only for political risk insurance of debt. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 n.8 (2007) (collecting cases).

DFC's burden is particularly heavy here because the implied exception it seeks would undermine FCRA's important purposes. Congress enacted FCRA to address a particular problem—that the pre-FCRA cash budgetary regime distorted the budgeting of federal credit activities in a way that hindered Congress's ability to exercise its power of the purse. *See supra* Part I.A. Congress solved that problem by creating a framework that brought different credit programs within a common, equitable accounting method and placed them on a level playing field with other federal spending. *See* 2 U.S.C. § 661(2), (4). The uniform application of FCRA's budgeting rules is thus central to Congress achieving its objectives, as deviations from those rules—and, specifically, cash budgeting for loan guarantees—enable agencies to impose potentially substantial costs on the federal government without budgeting for those costs in advance. And Congress recognized the importance of uniformity when it "supersede[d], modif[ied], or repeal[ed] any" preexisting laws to the extent they were "inconsistent" with FCRA. *Id.* § 661f(a). We thus will not lightly infer that Congress, without saying so expressly, has "overrid[den] [FCRA's] background rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013).

Legislative and administrative practice confirm this approach. Both in FCRA itself and in subsequent legislation, Congress has been express when it has excepted credit programs from FCRA's budgeting rules. *See*, *e.g.*, 2 U.S.C. § 661e(a); 12 U.S.C. § 1715z–23(w)(1). That further militates in favor of caution before inferring additional implied exceptions. *Cf. Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (stating that, when "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980))). Indeed, such caution has been the norm to date—as noted above, OMB indicated that it is unaware of any instance in which it or GAO has concluded that a program was impliedly exempted from all of FCRA's requirements. *See supra* Part I.A.

## B.

To overcome the presumption against implied repeals, DFC argues that the BUILD Act treats loans and loan guarantees differently from political risk insurance and, in so doing, ratifies and carries forward a pre-BUILD Act understanding that FCRA did not cover OPIC's political risk insurance of debt. But neither the statutory text nor historical practice speaks as clearly as DFC suggests, and DFC's arguments thus fall short of providing the "clear and manifest" evidence necessary to find that the BUILD Act displaces FCRA. *Me. Cmty. Health Options*, 590 U.S. at 315 (quoting *Morton*, 417 U.S. at 551).

## 1.

DFC first observes that the BUILD Act expressly declares that DFC's loan and loan guarantee programs are "subject to the requirements of [FCRA]," 22 U.S.C. § 9621(b)(3); *see id.* §§ 9622(b)(10), 9634(b)(6), (d)(1)(A), (d)(2), but says no such thing about political risk insurance, *id.* § 9621(d). Per DFC, this distinction creates a negative implication that FCRA does not apply to its political risk insurance. DFC Submission attach. at 4–5. As the Supreme Court has explained, "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023);

*see also, e.g.*, *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015).

But we think this different language, while striking, signifies less than it first appears. As the Supreme Court has also explained, the "force of any negative implication . . . depends on context." *Marx*, 568 U.S. at 381. Moreover, the "background presumptions governing" a subject can be "a highly relevant contextual feature" that may render "dubious" the conclusion that Congress intended to "override th[ose] background rule[s]." *Id.* at 381–82; *see also id.* at 381–84 (rejecting the argument that Congress had impliedly abrogated background rules governing attorneys fees and costs by expressly reiterating those rules only in part); *United States v. Vonn*, 535 U.S. 55, 65 (2002) (holding that a negative implication failed to establish the "strong support" necessary to demonstrate an implied repeal).

Here, context provides another plausible explanation for why the BUILD Act may have referenced FCRA with respect to loans and loan guarantees but not political risk insurance: FCRA governs all of DFC's loans and loan guarantees, but not all of DFC's political risk insurance, which can cover non-debt as well as debt products. *Supra* Part I.B.2; *see* 2 U.S.C. § 661a(3). Around the time of the BUILD Act's passage, in fact, political risk insurance of debt made up only 20% of OPIC's insurance portfolio. *Supra* Part I.B.1. We are thus hesitant to read too much into the lack of a FCRA cross-reference in a provision authorizing DFC to insure both debt and non-debt products—particularly when the Congress that enacted the provision had reason to believe that the majority of the insurance DFC would issue under the provision would cover non-debt products outside FCRA's scope.

Background presumptions further support this understanding: A key virtue of establishing FCRA as a background rule is that Congress need not specifically address every situation that might trigger FCRA, as FCRA itself takes care of such situations. Hence, as noted above, many credit programs across the federal government are unquestionably subject to FCRA even though their statutory authorizations do not mention it. *Supra* Part I.A. Here, DFC does not point us to, and we have not located, anything in the BUILD Act's legislative history showing that Congress meant to exempt DFC's political risk insurance of debt from FCRA. As far as we are aware, no member of Congress so much as raised FCRA's

application to DFC's insurance of debt in the process of enacting the BUILD Act, let alone expressed an intent for FCRA not to apply. In the face of such silence, we do not think the lack of a cross-reference to FCRA in the BUILD Act's subsection authorizing the issuance of political risk insurance—which has historically covered mostly non-debt products—is the sort of "clear and manifest" evidence required to repeal an important framework statute's applicability to DFC's insurance of debt under that provision.

## 2.

DFC also relies on history. After FCRA, Congress treated OPIC's political risk insurance as distinct from its loans and loan guarantees, funding the latter through annual appropriations but the former through a mandatory appropriation via a "noncredit account revolving fund." Jobs Through Exports Act §§ 104(a)(2), 106. Congress also expressly stated that "[a]ny payments made to discharge liabilities under [loan guarantees] or [loans] shall be paid in accordance with [FCRA]," but that "[a]ny payments made to discharge liabilities under investment insurance or reinsurance . . . shall be paid first out of the noncredit account revolving fund"—without mentioning FCRA. 22 U.S.C. § 2195(d) (2018). Moreover, OMB and OPIC's 2004 agreement treated some political risk insurance as exempt from FCRA. *See supra* Part I.B.1. DFC claims that this history, taken together, supports its view that the BUILD Act ratified and extended a pre-existing understanding that FCRA does not cover political risk insurance of debt. DFC Submission attach. at 8–10.

But DFC's arguments from history run into problems similar to those with its negative implication argument based on the BUILD Act. Like DFC, OPIC provided political risk insurance for non-debt as well as debt transactions, pursuant to a statute that did not distinguish between these two types of insurance. *See, e.g.*, 22 U.S.C. §§ 2194(a), 2195(d) (2018). And, as noted above, non-debt transactions appear to have made up the bulk of OPIC's insurance portfolio. *See* DFC Responses at 4. Moreover, just like with the BUILD Act, DFC identifies nothing in the legislative history of the pre-BUILD Act regime showing that Congress intended to exempt political risk insurance of debt from FCRA. If anything, the fact that Congress funded all insurance out of a "*noncredit* account revolving fund" suggests it did not focus on the fact that OPIC insured debt as well

as non-debt transactions. So while the post-FCRA amendments provide some support for DFC's position, we cannot say they supply "clear and manifest" evidence that the BUILD Act—a separate statute enacted over a decade after the amendments in question—recognized an implied exemption from FCRA.

Administrative practice also cannot bear the weight DFC would place on it. It is true that OMB and OPIC agreed not to apply FCRA's requirements to a portion of OPIC's political risk insurance of debt. But during the decade and a half that this agreement was in force, OPIC entered into only 12 transactions it called "political risk insurance," and OMB concluded, based on a "case-by-case analysis," that eight of those transactions were "in substance" more like commercial loan guarantees than "more limited insurance polic[ies]" falling squarely within OPIC's authority to insure against political risks of expropriation, currency inconvertibility, and political violence. Kaplan Letter at 1–2; *accord* DFC Responses at 2. This mixed administrative practice is a thin reed on which to hang a ratification argument.

More than that, ratification of the pre-BUILD Act status quo is not what DFC seeks. The BUILD Act gives DFC broader authority to issue political risk insurance than OPIC possessed, allowing DFC to insure against "any or all political risks," 22 U.S.C. § 9621(d), and not just the specific enumerated risks against which OPIC could insure. In DFC's telling, then, the FCRA exemption now encompasses all the policies it may issue under this broader authority—including, as we understand it, the eight so-called "insurance" policies that OMB deemed subject to FCRA.

We think this significant expansion in scope strongly cuts against DFC's position. If DFC were right that the BUILD Act impliedly exempts its political risk insurance of debt from FCRA, this would dramatically expand DFC's ability to issue insurance policies that carry potentially significant fiscal burdens without budgeting for their costs in advance. It seems unlikely that Congress would have taken this step without recording some express indication in the BUILD Act's text or legislative history that it was doing so. In any event, this silence underscores that DFC has not identified the type of "clear and manifest" evidence necessary to establish an implied repeal of FCRA.

### 3.

DFC also points to discrete, technical conflicts between the BUILD Act's provisions governing insurance of debt and FCRA—conflicts that DFC claims support its view that the BUILD Act and FCRA are irreconcilable. But it is not unheard of for technical aspects of a credit program to clash with FCRA in some respect. *See* OMB Responses at 2–3. And in such situations, OMB traditionally works to implement FCRA in a way that harmonizes the two statutes, rather than displaces FCRA entirely, *id.* at 2, 5 n.1—an approach that accords with the preference for "harmony over conflict in statutory interpretation," *Epic Sys.*, 584 U.S. at 511. Consistent with this traditional practice, we do not believe any of the discrete conflicts identified by DFC suggest that Congress intended a wholesale carveout of DFC's political risk insurance from FCRA.

First, DFC claims that the BUILD Act and FCRA contain opposing commands about where to deposit insurance-related receipts. DFC Submission attach. at 7. FCRA says that collections go to a financing account, 2 U.S.C. § 661a(7); the BUILD Act says they go into DFC's Corporate Capital Account, 22 U.S.C. § 9634(b), (d)(2). But we do not make too much of this inconsistency: The BUILD Act also generally requires DFC to deposit cash inflows from its loan and loan guarantee programs, which FCRA undeniably covers, into the Corporate Capital Account. *Id.* And although the BUILD Act excludes the subsidy "cost" of loans and loan guarantees from that requirement, it does not exclude other receipts associated with the programs, such as loan repayments. *Id.* Any inconsistencies between the BUILD Act and FCRA in this respect thus reveal little, particularly because Congress appears to have anticipated the possibility of conflicts like this one by including in FCRA authorization for the President "to establish such non-budgetary accounts as may be appropriate" to "implement the accounting required by this subchapter." 2 U.S.C. § 661d(b). Congress thus recognized that account structures under organic statutes might not perfectly fit FCRA and provided authority to fix any issues.

Second, DFC asserts that the BUILD Act does not authorize it to pay for the subsidy "cost" of insurance, as required by FCRA. DFC Submission attach. at 7–8; 2 U.S.C. § 661c(b). We disagree. DFC's Corporate Capital Account can be used "to carry out [the account's] purpose," 22 U.S.C.

§ 9634(d)(2), which includes all of DFC's purposes, *id.* § 9634(a). That general appropriation provision allows DFC to pay for the subsidy cost of insurance of debt, even assuming no more specific authority exists.

Finally, DFC argues that even if the BUILD Act contains an appropriation for the subsidy cost of political risk insurance, this permanent appropriation fails to satisfy FCRA's requirement for advance authorization in an "appropriations Act." DFC Submission attach. at 11–12; 2 U.S.C. § 661c(b). In particular, DFC contends that "appropriations Act" means an annual appropriations bill, which the BUILD Act is not. DFC Submission attach. at 11. OMB disagrees, maintaining that mandatory appropriations can be, and have been, used to satisfy FCRA's "appropriations Act" requirement. OMB Submission at 8; OMB Responses at 5–6. But we need not resolve this issue: Even if DFC were correct, that would not show that the BUILD Act exempts political risk insurance of debt from FCRA in full. Rather, it would require only finding an implied modification of FCRA's "appropriations Act" requirement to encompass the BUILD Act's permanent appropriation—a narrower approach that would harmonize the two laws to the greatest extent possible and draw support from history and practice. Indeed, OMB argues that while Congress has never silently exempted a credit program from all of FCRA's requirements, Congress often has funded credit programs outside the annual appropriation process. OMB Submission at 8 & n.43; *see, e.g.*, CARES Act, Pub. L. No. 116-136, §§ 1102, 1107(a)(1), 134 Stat. 281, 286, 301 (2020) (codified as amended at 15 U.S.C. §§ 636(a)(36), 9006) (Paycheck Protection Program). Thus, even if DFC's understanding of "appropriations Act" is correct, the BUILD Act merely follows a long line of programs that impliedly displace this discrete aspect of FCRA without working a full repeal.

### III.

For these reasons, we conclude that political risk insurance of debt issued under the BUILD Act is subject to FCRA.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*